NIAGARA OF WISCONSIN PAPER CORPORATION, Petitioner-Respondent, v. DEPARTMENT OF NATURAL RESOURCES, Appellant. [Case No. 76–668.]
FORT HOWARD PAPER COMPANY, Petitioner-Respondent, v. DEPARTMENT OF NATURAL RESOURCES, Appellant. [Case No. 77–326.]

*Nos. 76–668, 77–326. Argued May 1, 1978.—Decided June 30, 1978.*
(Also reported in 268 N.W.2d 153.)

34

For the appellant there were briefs by *Bronson C. La Follette,* attorney general, and *Linda M. Clifford,* assistant attorney general, and all argument by *Mary V. Bowman,* assistant attorney general. [Case No. 76–668.]

For the respondent there was a brief by *Charles Q. Kamps, Andrew M. Barnes* and *Quarles & Brady* of Milwaukee, and oral argument by *Mr. Kamps.* [Case No. 76–668.]

Brief amicus curiae, United States, was filed by *Sanford Sagalkin,* acting assistant attorney general, and *Angus MacBeth* and *Donald W. Fowler,* attorneys, Department of Justice, Washington, D. C., and *Joan Z. Bernstein,* general counsel, *Alan W. Eckert,* deputy associate general counsel, and *Mary Bryant Kodani,* assistant regional counsel, Region V, Environmental Protection Agency, Washington, D. C. [Case No. 76–668.]

For the appellant the cause was argued by *Mary V. Bowman* assistant attorney general, with whom on the briefs was *Bronson C. La Follette,* attorney general. [Case No. 77–326.]

For the respondent there was a brief by *Irvin B. Charne, Raymond R. Krueger* and *Charne, Glassner,*

*Tehan, Clancy & Taitelman, S. C.* of Milwaukee, and oral argument by *Irvin B. Charne.* [Case No. 77–326.]

Brief amicus curiae, United States, was filed by *Sanford Sagalkin,* acting assistant attorney general, and *Angus MacBeth* and *Donald W. Fowler,* attorneys, Department of Justice, Washington, D. C., and *Joan Z. Bernstein,* general counsel, *Alan W. Eckert,* deputy associate general counsel, and *Mary Bryant Kodani,* assistant regional counsel, Region V, Environmental Protection Agency, Washington, D. C. [Case No. 77–326.]

BEILFUSS, C. J.   These cases involve the interpretation and application of ch. 147, Stats.  This chapter, enacted in 1973, is based on the Federal Water Pollution Control Act Amendments of 1972 (FWPCAA), 33 U.S.C., sec. 1251 et seq.  The FWPCAA begins with a policy statement:

"Sec. 1251 *Congressional declaration of goals and policy*
"(a) The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.  In order to achieve this objective it is hereby declared that, consistent with the provisions of this chapter—
"(1) It is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985."

This primary, national goal—the elimination of all pollution discharge by 1985—is also set forth in ch. 147, sec. 147.01(1)(a), as the primary objective of the State Act.

The Federal Act, 33 U.S.C., sec. 1311, prohibits the discharge of pollution except under a National Pollution Discharge Elimination System (NPDES) permit.  Sec. 1342, 33 U.S.C., provides that states wanting to administer their own permit programs may do so.  Such programs must have standards at least as stringent as those of the federal programs, but may be more strict if the state wishes.  Accordingly, Wisconsin enacted ch. 147, Stats., which authorizes the DNR to implement a Wisconsin ' Pollution Discharge Elimination System (WPDES) program.  A key provision in the Wisconsin

Act, and a central focus of this case, is sec. 147.021, Stats.:

> *"Compliance with federal standards.* All rules adopted by the department pursuant to this chapter as they relate to point source discharges, effluent limitations, water quality related limitations, municipal monitoring requirements, standards of performance and toxic and pretreatment effluent standards *shall comply with and not exceed* the requirements of the federal water pollution control act amendments of 1972, P.L. 95–500, and regulations adopted pursuant thereto." (Emphasis added.)

As part of the plan to reduce pollution discharge, both Acts set forth a timetable to attain effluent limits. By July 1, 1977, "point sources" discharging pollutants are to limit effluent by utilizing the "best practicable control technology currently available." (BPT) 33 U.S.C., sec. 1311(b)(1)(A), sec. 147.04(2)(a), Stats. Acceptable effluent standards under BPT are to be determined by the Administrator of the United States Environmental Protection Agency (EPA). The second stage of effluent limitation, not involved in this case, requires the application of the "best available technology economically achievable" (BAT), by July 1, 1983. 33 U.S.C., sec. 1311 (b)(2)(A); sec. 147.04(2)(b), Stats. Until final determinations of effluent limitations feasible under the above standards are determined, sec. 147.04(5), Stats., provides that the DNR may adopt interim limitations.

The DNR issued interim effluent limitations applicable to the paper companies involved in these cases on February 1, 1974, and reissued substantially the same limitations on February 28, 1975. NR 283, Wis. Adm. Code (1974–1975). These interim limitations were based on an EPA guidance document entitled "Interim Effluent Guidance for NPDES Permits," dated May 3, 1973. Interim final BPT effluent limitations were published by the EPA on February 19, 1976. (41 Fed. Reg. 7662)

Final limitations were published on January 6, 1977. (41 Fed. Reg. 1397) Identical limitations were adopted in Wisconsin on February 17, 1977. NR 284, Wis. Adm. Code (1977). It is uncontroverted that the final BPT effluent limitations are less stringent than the interim effluent limitations adopted by the DNR and outlined in the 1973 EPA guidance document.

On June 26, 1974, the DNR issued a WPDES permit to Niagara allowing it to discharge pollutants from its paper mill into the Menominee River. The permit was to expire on December 31, 1978. It began under the interim effluent limitations and overlapped into the interim final and final EPA–BPT standards.

On August 23, 1974, Niagara petitioned the DNR for an adjudicatory hearing under sec. 147.20, Stats., to challenge the reasonableness and necessity of the permit terms. A hearing was held on August 21, 1975. Niagara contended that its permit should not specify effluent limits because the EPA had not promulgated actual limits, only guidelines, and because the interim limits adopted by the DNR had been adopted without benefit of a formal rule-making process. A DNR official admitted that the DNR was aware of the impending issuance of interim final effluent limitations around January 1st of 1976 by EPA, and indicated the DNR's complete reliance on the EPA guidelines in setting effluent limits.

When the DNR issued its findings of fact, conclusions of law, and order of July 28, 1976, it affirmed the effluent limitations in Niagara's permit despite the fact that the EPA had issued interim final effluent limitations on February 19, 1976. The DNR intimated that only final EPA rules were binding and that if final EPA rules necessitating amendment for NR 283 were issued, Niagara could again petition for modification.

Niagara commenced this action to review the DNR decision in Dane County Circuit Court on August 25,

1976. While judicial review was pending, the EPA issued its final effluent limitations on January 6, 1977. As noted *supra,* the DNR adopted these limitations on February 17, 1977. In a letter dated March 4, 1977, the DNR refused to modify the WPDES permit to bring it into alignment with the new limitations. The DNR contended that, new limitations notwithstanding, it would not modify Niagara's permit before its termination date unless Niagara demonstrated that it was unable to achieve the discharge limitations set forth in the permit.

On March 31, 1977, the Circuit Court for Dane County, GEORGE R. CURRIE, Reserve Circuit Judge, reversed the DNR order and remanded, with directions, that the permit be modified to meet the new effluent limitations. The court held that the refusal of the DNR to modify Niagara's WPDES permit to comply with the less stringent effluent limitations set forth in the final EPA limitations constituted a violation of sec. 147.021, Stats.:

"It is the Court's considered judgment that to accord DNR such power would nullify the legislative purpose underlying the enactment of sec. 147.021, Stats., which was to insure that DNR prescribed effluent limitations should not exceed the requirements of FWPCAA and any EPA regulations adopted pursuant thereto. The legislature may well have concluded that Wisconsin industries should not be put under the competitive disadvantage of having to meet effluent limitations more stringent than those prescribed by EPA which their out of state competitors might not be required to do."

On November 15, 1974, respondent Fort Howard was issued a WPDES permit to discharge pollutants from its plant in Green Bay into the Fox River. The permit was to expire on December 31, 1978. As in the Niagara Case, it began under the interim limitations and overlapped into the interim final and final EPA limitations. On December 9, 1974, Fort Howard petitioned the DNR for an

adjudicatory hearing to review certain permit terms. In its petition, Fort Howard averred, inter alia, that the effluent limitations set forth in the permit were not attainable by application of BPT. Fort Howard also challenged a limitation on phosphorus discharge.

Hearings on the matter were held on May 5–8, June 5, and June 23, 1975. Although modifying the phosphorus limits, on January 30, 1976, the hearing examiner affirmed the permit in all other respects. The phosphorus reduction was granted because neither the NR 283 nor the EPA guidelines set any phosphorus limitations. As to the other challenges, the examiner stated that it would be inappropriate for a hearing examiner to void a "lawfully promulgated regulation" of the DNR or to modify any permit based on such a regulation prior to any revision of the regulation.

On February 20, 1976, Fort Howard commenced this action to review in the Circuit Court for Dane County. Judge BARDWELL reversed the decision of the Department and remanded for modification of the permit on August 24, 1977. Noting that the EPA had set final limitations and that new state regulations had been adopted to comply with them since the issuance of the permit, Judge BARDWELL concurred with Judge CURRIE's decision in the Niagara Case:

"[T]hat the DNR's refusal to modify a discharge permit to comply with federal regulations would nullify the legislative purpose underlying sec. 147.021, Stats. The department's refusal to modify the permit also would nullify the effect of sec. 147.04(2)(a), Stats., because Fort Howard would be required to meet a more stringent standard for effluent discharge than is attainable by application of BPT."

Judge BARDWELL also ordered the DNR to eliminate the phosphorus limitations because no such limitations were contained in the regulations. In light of this hold-

ing, Judge BARDWELL declined to decide whether the DNR had had the authority to promulgate the interim standards or whether Fort Howard had been denied due process by the hearing examiner's refusal to decide whether those interim standards were attainable.

We deem the issues to be the following:

1. Was the DNR required to modify the permits to conform to the final rules adopted by the EPA and the DNR subsequent to the issuance of the permits:

(a) By sec. 147.021, Stats., requiring that state rules concerning effluent limitation cannot exceed federal standards?

(b) By the fact that the permits were issued under interim rules of limited duration and with no regard for a final due process determination of BPT?

2. Is the requirement that the DNR adopt as yet undeveloped federal standards such as BPT and BAT an unlawful delegation of legislative power?

3. Did the DNR have the authority to include phosphorus limitations in Fort Howard's permit?

Sec. 147.021, Stats., requires that rules relating to, inter alia, effluent limitations "shall comply with and not exceed" the requirements of the FWPCAA "and regulations adopted pursuant thereto." It is clear that this statute requires the DNR to adopt the EPA regulations as promulgated by the EPA. To accept the DNR's argument that the federal regulations provide only guidance would be to ignore the plain meaning of the legislative command that DNR rules "comply" with the federal regulations.

Furthermore, the DNR's assertion that sec. 147.021, Stats., should be read to require compliance with only those regulations in existence in 1972, or in 1973 when ch. 147 was created, would be inconsistent with the intention of the statute. The federal regulations expressing

final effluent limitations were not promulgated until 1977. Before the issuance of interim final BPT limitations in 1976 there were no regulations, only guidelines. To follow the DNR's suggestion would be to read the phrase "and regulations adopted pursuant thereto" out of sec. 147.021 as a nullity. This would violate the rule that effect is to be given, if possible, to every word, clause, and sentence in a statute.[2]

This court has often stated that words and phrases are to be given their ordinary and common meaning and that such meaning may be established by the definition in a recognized dictionary.[3] Webster's Third International Dictionary, p. 1848 (1964), defines "pursuant to" as "in the course of carrying out." Clearly, regulations adopted by the EPA to interpret and enforce the policies of the FWPCAA are aimed at carrying out that act even if promulgated since the enactment of ch. 147. As such they are binding on the State of Wisconsin under sec. 147.021, Stats.

The real issue, therefore, is not whether the DNR is required to adopt these rules—it is and it has. The question is whether WPDES permits issued under interim rules based on EPA guidelines must be revised to reflect the final EPA regulations which the DNR has adopted.

The DNR terms its main argument a "policy of finality." DNR asserts that if its permits are not vested with some finality, if every change in a rule or regulation would demand a change in the permit, there would result an administrative nightmare of uncertainty, modification requests, and delay. On the other hand, the paper companies contend and the circuit courts agreed that sec. 147.-021, Stats., stands for a policy of uniformity; that while recognizing the need for effluent limitations, the legisla-

[2] *Fuller v. Spieker*, 265 Wis. 601, 603, 62 N.W.2d 713 (1954).
[3] *State v. Killory*, 73 Wis.2d 400, 413, 243 N.W.2d 475 (1976).

ture sought to insure that Wisconsin industries would have an equal footing with competitors in other states, and that this policy would be defeated if permits issued under the older, more stringent rules are not modified.

The DNR relies on two cases which have adopted the finality argument. In *In re U. S. Pipe and Foundry Company*, 8 E.R.C. 1401, 1403–1404 (1975), the administrator of the EPA concluded that NPDES standards should be fixed at the time a final permit is issued. This policy was approved when the EPA decision in *U. S. Pipe and Foundry* was appealed. *Alabama ex rel. Baxley v. Environmental Protection Agency*, 557 F.2d 1101, 1110 (5th Cir. 1977).

These cases can be distinguished on several bases. The most significant basis is that the FWPCAA has no policy equivalent to that expressed in sec. 147.021, Stats. Thus the finality policy is of limited persuasiveness if contrary to the legislative policy, expressed in sec. 147.-021, that state industries should not operate under more stringent standards than those recognized by the EPA. Another case which the DNR cites to support its finality policy can be discounted. The United States Supreme Court in *E. I. du Point de Nemours v. Train*, 430 U.S. 112 (1977), takes note of a provision in the FWPCAA, not in ch. 147, which expresses a finality policy. The court did not specifically approve of this policy—it merely noted that it exists.

The DNR further argues the need for a finality policy in two hypotheticals. It contends that to allow permits to change when rules change would set back pollution control efforts. There is some truth to this, but what this argument assumes is that rules are changing frequently enough to disrupt the permit program goals. There is not and has not been a constant variation in these regulations. Except for the slowness of EPA in is-

suing interim final and final effluent limitations, there has been only the change from the guidelines to the regulations. There has not been any change in the regulations since EPA issued them and there is no reason to suspect that they will be changed in the immediate future. The same can be said with respect to the upcoming BAT standards to be met by 1983—once EPA determines final BAT limitations there is no reason to suspect that these will not be anything less than final.

EPA has not changed its rules at any time. What happened was that the DNR incorrectly accepted EPA *guidelines* as BPT standards. DNR issued the five-year permits on these guidelines and now argues its finality policy despite the fact that these guidelines were never intended to be final.

DNR's finality policy is in direct conflict with sec. 147.04 (5), Stats., which states:

"(5) Until such time as the department shall promulgate an effluent limitation for a particular category or class of point sources, the department may adopt interim effluent limitations to carry out the purposes of this chapter. Interim effluent limitations shall be adopted as rules by the department as prescribed under s. 227.027 for a period not to exceed one year. This authority shall expire within 2 years after July 22, 1973."

Sec. 227.027, Stats., provides for promulgation of emergency rules without notice or hearing. As pointed out by Niagara, sec. 147.04 (5) emphasizes that the interim rules were intended to be temporary and have effect only until promulgation of effluent limits by the EPA. Although the interim rules were needed for a longer period than the legislature had foreseen due to the delay involved in issuing EPA limitations, it is inescapable that these rules were to be superseded by more formal rules as soon as possible. The one-year limit on

these rules casts considerable doubt on the validity of the present permits. To allow a five-year permit to be issued on the basis of a rule which has authority limited to one year is a circumvention of a legislative safeguard which intended that the exception given here to the normal rule-making process not be abused.

It appears certain to us that the Wisconsin legislature intended that Wisconsin industrial polluters be bound only to a final determination of BPT. This does not necessarily mean that every time that BPT is revised that the permits must be too. What it does mean is that permittees are entitled to an actual determination of BPT in accordance with due process. This did not occur here.

The time limits on the interim rules clearly indicate that the legislature considered them stopgap measures preliminary to an actual due process determination of BPT. Although the EPA and some federal courts have determined that permits based on guidelines or even without guidelines are permissible and binding, *Alabama ex rel. Baxley v. EPA, supra; United States Steel Corporation v. Train,* 556 F.2d 822, 844 (7th Cir. 1977); the experience of the EPA or federal courts is not authoritative on the issue of whether the paper companies deserved a full due process determination of BPT after expiration of the interim rules, which unlike the federal interim provisions have an express time limit. Sec. 147.04(2)(a), Stats., requires that the DNR establish effluent limitations by rule. The effluent limitations in the permits were never subjected to the formal rule-making process. Rather they were adopted as interim rules which the DNR accepted, with no exercise of its own discretion, the EPA guidelines or early estimates of BPT. The one-year time limit on the interim rules is clear indication that such rules, and permits issued under

them, were not to be unalterably binding but were to give way to formally promulgated rules as soon as the EPA issued its final effluent limitations.

The DNR responds that the administrative interpretations of a statute which an agency administers or enforces is entitled to great weight.[4] Not only the DNR, but also the EPA through the United States as *amicus curiae,* supports the position that the permits are binding notwithstanding the issuance of a final, less stringent federal standard. Although the EPA presents good arguments under federal law in favor of DNR's position, these cases are dependent on state law. The crux of this problem lies in the interpretation of provisions unique to the Wisconsin Act—*e.g.,* secs. 147.021 and 147.04(5), Stats. Thus the question is—what was the intent of the Wisconsin legislature?

An agency charged with administering a law may not substitute its own policy for that of the legislature.[5] As noted, *supra,* it is apparent that the legislature intended Wisconsin industries to be bound only by a final determination of BPT—thus the requirements that the interim rules have limited effect and that BPT be promulgated as a rule. It is also clear that the standard of BPT which the legislature has determined that Wisconsin industries must comply with is the final determination of the EPA. The DNR's position that permits may prescribe a different standard of BPT than that actually recognized by the EPA and made applicable to Wisconsin by sec. 147.021, Stats., is not only contrary to the legislative policy of uniformity and nondiscrimination against Wisconsin industry, but also denied Fort

---

[4] *Milwaukee v. WERC,* 71 Wis.2d 709, 715, 239 N.W.2d 63 (1976).

[5] *Clintonville Transfer Line v. Public Service Comm.,* 248 Wis. 59, 69, 21 N.W.2d 5 (1945).

Howard and Niagara due process because these five-year permits could not be issued under the limited interim rules without eventually going through the formal rulemaking process.

The due process aspect of this case is crucial. If this were simply a balancing of the DNR's finality policy versus the apparent but not well-defined legislative policy that not only the DNR rules, but also DNR permits must conform to the final standard of BPT, it could be possible to agree with DNR's separation of permits from rules. However, the issuance of a five-year permit under a rule limited to one year's applicability is a circumvention of the legislature's intention that final BPT regulations apply. The permits issued under ch. 147 in these cases demand a modification to comply with effluent limitations promulgated by DNR under the formal rulemaking process. This must be done to satisfy due process.

Other issues were raised by the paper companies which the circuit courts did not address, nor do we because of our conclusion the permits must be modified.

In both cases the DNR contends that the trial courts' interpretations of sec. 147.021, Stats.—that permits issued under earlier EPA standards must be reformed to conform with existing EPA standards—violate the provisions of the Wisconsin Constitution prohibiting the delegation of legislative power. Art. IV, sec. 1; Art. IV, sec. 17 (formerly Art. VII, sec. 21). Although a state agency cannot normally challenge the constitutionality of a statute,[6] the DNR does not contend that sec. 147.021 is unconstitutional *per se,* only that the circuit court interpretation is unconstitutional. Exactly how the DNR

---

[6] *State ex rel. La Crosse v. Rothwell,* 25 Wis.2d 228, 233, 130 N.W.2d 806, 131 N.W.2d 699 (1964).

believes that sec. 147.021 should be interpreted is unclear. In the Niagara Case, DNR states:

"Therefore, the statute must be read more narrowly, so as to require only that DNR adopt rules identical with federal rules or regulations existing in 1972."

On the other hand, in the Fort Howard Case, the DNR states that:

"The only way to avoid such a reading is to construe sec. 147.021 to make EPA rules a standard by which to measure the DNR's independently adopted rules."

In both cases the DNR notes that statutes should be construed so as to avoid constitutional objections.[7] However, we must also apply the rule that statutes are presumed to be constitutional and that unconstitutionality must be demonstrated beyond a reasonable doubt.[8] A statute should also be given its plain meaning as determined from the language of the statute itself.[9]

The wording of sec. 147.021, Stats., does not support either of the DNR's positions. The reference to the FWPCAA "and *regulations adopted* pursuant thereof" does not reasonably limit sec. 147.021 to federal regulations in effect when 147.021 was adopted, particularly when it is apparent that final EPA regulations on BPT were not issued until well after ch. 147 was created.

We conclude the trial court's interpretations do not render sec. 147.021, Stats., unconstitutional.

[7] *Milwaukee v. Milwaukee Amusement, Inc.*, 22 Wis.2d 240, 251, 125 N.W.2d 625 (1964).

[8] *State ex rel. Hammermill Paper Co. v. La Plante*, 58 Wis.2d 32, 46, 205 N.W.2d 784 (1973).

[9] *State v. Consolidated Freightways Corp.*, 72 Wis.2d 727, 736, 242 N.W.2d 192 (1976).

The DNR relies on an Attorney General's opinion, 50 Op. Atty. Gen. 107, 113 (1961), where it is stated that:

". . . attempted incorporation by reference of future federal statutes would constitute an unlawful delegation of legislative power."

The fact is that sec. 147.021, Stats., does not incorporate a future federal statute by reference. Rather, it incorporates an existing federal statute and regulations to be developed by the EPA under that statute. As such, this case falls directly under the rule stated in *State v. Wakeen*, 263 Wis. 401, 407–09, 57 N.W.2d 364 (1953). There the court commented that the rule that a legislature may not delegate its power to make a law is considered "well settled," but that it is just as well recognized "that the legislature may delegate any power which it may itself rightfully exercise which is not legislative." The court continued:

"This court has recognized also the rule that the legislature may enact a statute, the operation of which is dependent on the happening of a contingency fixed therein, and that such contingency may consist of the determination of some fact, even if said fact is determined by private individuals." 263 Wis. at 407–08. *See also, Clintonville Transfer Line v. Public Service Comm.*, 248 Wis. 59, 68–69, 21 N.W.2d 5 (1945).

In *Wakeen* the court upheld a statute which defined "drug" by reference to the "official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, *or any supplement to any of them*." (Emphasis supplied.)

The case at hand is closely analogous to *Wakeen*. In *Wakeen* the delegation was to several entities whose expertise qualified them to define drugs. In this case the delegation is to the EPA whose expertise qualifies it to

define BPT. The Wisconsin legislature has enacted the law requiring BPT. By delegating the task of determining what BPT is to a federal agency, it has not delegated its law-making powers. Rather, it has simply delegated the complicated fact determinations upon which the legislative policy is contingent. The *Wakeen* court approved of such delegations, noting that:

". . . 'Since legislation must often be adapted to complex conditions involving a host of details with which the legislature cannot deal directly, the constitutional inhibition against delegating legislative authority does not deny to the legislature the necessary resources of flexibility and practicality, enabling it to lay down policies and establish standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature shall apply. Without this power, legislatures would often be faced with the anomaly of possessing a power over a given subject, but being unable to exercise it.' " 263 Wis. at 409.

It should also be pointed out that EPA determinations under the FWPCAA do not automatically become administrative law in Wisconsin. The DNR still makes the rules; however sec. 147.021, Stats., requires that it comply with and not exceed the federal determinations. This acts as a safeguard, preventing a complete by-pass of state agencies and making possible public scrutiny of the federal changes. This also results in publication of the rules as required by Art. IV, sec. 17, Wisconsin Constitution. Furthermore, the legislature can change sec. 147.021 at any time. Any delegation which takes place under sec. 147.021 is a reasonable delegation which subordinates the determinations of the EPA to the stated policy of the legislature favoring the elimination of all pollutant discharge by 1985 and the application of BPT as a means to that end. Secs. 147.01(1)(a), 147.04 (2).

In its hearing before the DNR, Fort Howard challenged the phosphorus limitations contained in the WPDES permit. The hearing examiner found that because no references to phosphorus limitations could be found in NR 283 of the Wisconsin Administrative Code, in ch. 147, Stats., or in the FWPCAA, the phosphorus limitations were unreasonable. However, the examiner did not eliminate all phosphorus limitations. The limitations were reduced to conform with limitations required by sec. NR 102.04 of the Administrative Code. Ch. NR 102 deals with "Water Quality Standards for Wisconsin Surface Waters," and is based on sec. 144.025(2)(b), Stats., requiring the DNR to set water quality standards.

The circuit court did not reach the issue of whether NR 102 and ch. 144, Stats., authorized the phosphorus limitations. The court apparently took the position that the requirements were more strict than those mandated by the EPA and therefore void under sec. 147.021.

The circuit court did not refer to sec. 147.02(3)(d)1, Stats., which provides:

"(3) The department may issue a permit for the discharge of any pollutant, or combination of pollutants other than those prohibited under sub. (2), upon condition that such discharges will meet all the following, whenever applicable: . . .
"(d) *Any more stringent limitations* including those:
"1. *Necessary to meet federal or state water quality standards. . . .*" (Emphasis added.)

The DNR notes that sec. 147.27, Stats., says that:

"*Savings clause.* Except as provided in this chapter, nothing in this chapter shall be deemed to supersede any other statute or session law."

Because sec. 147.02(3)(d)1, Stats., expressly allows for more stringent discharge permits which meet water quality standards, it appears that sec. 147.021 would not bar the inclusion of the phosphorus limitation in the

WPDES permit if, in fact, such limitation is a water quality standard.

Fort Howard does not contest DNR's contention that the phosphorus limitation is permissible if it constitutes a water quality standard. It is Fort Howard's position that the phosphorus limitation is an effluent limitation, not a water quality standard. Sec. 147.015(4), Stats., defines an effluent limitation as any restriction established by the DNR ". . . on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into waters of this state." The preamble to chapters NR 102 through 104 of the Wisconsin Administrative Code states that "Water quality standards are statements of the characteristics of a water which must be maintained to make it suitable for specified uses."

Effluent limitations and water quality standards are related, however significant differences exist between them. An effluent limitation is a measurement of pollutant discharge. It is measured at the source. A water quality standard is a measurement of the water itself and it does not focus on any single pollutor but necessarily comprehends all discharges into a given body of water.[10]

An examination of NR 102.04 indicates that those portions applicable to Fort Howard are effluent limitations, not water quality standards.[11] The language of NR 102.04 with respect to industrial wastes refers to

---

[10] See, EPA v. State Water Resources Control Board, 426 U.S. 200, 204–05 (1976); Bethlehem Steel v. Environmental Protection Agency, 538 F.2d 513, 514–15 (2d Cir. 1976); 1973 Wis. L. Rev. 893, 894.

[11] "NR 102.04 Enforcement. Financial assistance, industrial incentives, increased surveillance, orders, and permits will be means used to achieve and maintain the adopted water quality standards. Reasonable time schedules to comply with orders and permit conditions depend on the circumstances. All municipal sewage treatment plants shall provide a minimum of secondary

discharges and thus effluent limitation. The effluent limitation character of this section is apparent, given the references therein to the effluent requirements of the FWPCAA. The only part of NR 102.04 which refers to water quality, as that term is generally understood, refers to excess amounts of phosphorus where such discharges are causing overfertilization of surface waters. The DNR did not make a finding that Fort Howard was violating a water quality standard by causing overfertilization. Rather it relied on the effluent limitations in NR 102.04 which are set discharge standards or effluent limitations.

If on remand the DNR can show that a phosphorus limitation is necessary to meet a water quality standard, such limitation may be imposed. Sec. 147.02(3)(d)1, Stats. It may not rely on an effluent limitation which is more stringent than the FWPCAA effluent limitations without linking it to a violation of an actual water quality standard.

As this case stands, the DNR made no showing that the effluent limitation in NR 102.04 was actually based on an existing water quality standard or that Fort

treatment and effluent disinfection. Communities with a population of 2,500 and over in the lakes Michigan and Superior basins shall achieve an 85% reduction of phosphorus on an annual basis, and there shall be a commensurate removal from industrial wastes containing more than 2 mg/1 of total phosphorus and having an annual phosphorus discharge greater than 8,750 pounds. Any wastewater discharger—regardless of population, volume or type of waste discharge, or geographic location—may be required to remove excess amounts of phosphorus where such discharges are causing overfertilization of surface waters. A permit program is being initiated in accordance with the Federal Water Pollution Control Act Amendments of 1972 regarding treatment monitoring requirements for waste discharges to waters of the state. All industrial plants discharging wastes to surface waters are required to provide, as a minimum, an effluent quality established in accordance with the Federal Water Pollution Control Act Amendments of 1972."

Howard had violated such a standard. The focus of the DNR hearings was not on this issue, and as noted by Fort Howard, it would be improper in any event to affirm the DNR's interpretation because this issue did not receive a full and fair hearing below.[12]

The United States, an amicus curiae, argues that the phosphorus limitations are permissible as water quality standards. The United States does not address Fort Howard's arguments that the applicable language in NR 102 is in fact an effluent limitation disguised as a water quality standard or that this issue was not properly raised and discussed at the DNR hearing.

. Prime support for the United States' position comes from the fact that the EPA has approved NR 102 as a water quality standard under the Act. 33 U.S.C., sec. 1313(b); 42 Fed. Reg. 56792. However, this still does not explain why a water quality standard has been so clearly expressed as an effluent limitation.

This controversy points to the fact that the status of NR 102 was not in issue in the administrative hearing. We conclude it should not be accepted as a water quality standard until its nature is investigated in a full hearing.

In summary, we conclude that although the finality argument presented by DNR and EPA has its merits, the legislative policy expressed in sec. 147.021, Stats., would be clearly undermined if permits were distinguished from the rules upon which the permits were issued. If the rule changed, the permit should be amended to reflect the change. This policy becomes more forceful when the limited nature of the interim rules upon which the permits were based is examined. To issue a five-year permit on the basis of a one-year rule is to extend the rule beyond its intended application.

[12] *Wisconsin Telephone Co. v. ILHR Dept.*, 68 Wis.2d 345, 359–60, 228 N.W.2d 649 (1975).

No unconstitutional delegation of legislative power is sanctioned by sec. 147.021, Stats. Finally, the nature and extent of NR 102, Wis. Adm. Code was not fully heard and considered by the DNR. Therefore the phosphorus limitations should be deleted until the matter is reconsidered by the Department.

*By the Court.*—Judgments affirmed.