MAPLE LEAF FARMS, INC., Plaintiff-Appellant,†

v.

STATE of Wisconsin-DEPARTMENT OF NATURAL RESOURCES, Defendant-Respondent.

Court of Appeals

*No. 00–1389. Oral argument April 24, 2001.—Decided July 3, 2001.*

2001 WI App 170

(Also reported in 633 N.W.2d 720.)

† Petition to review denied 9-19-01.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of and oral argument by *Matthew H. Quinn* of *Hand & Quinn, S.C.* of Racine.

On behalf of the defendant-respondent, the cause was submitted on the brief of *John S. Greene*, assistant attorney general, and *James E. Doyle*, attorney general. There was oral argument by *John S. Greene*.

An nonparty brief was filed by *David A. Crass, Mary C. Turke* and *Porter J. Martin* of *Michael Best & Friedrich LLP* of Madison.

Before Brown, P.J., Nettesheim and Snyder, JJ.

¶ 1. BROWN, P.J. Maple Leaf Farms, Inc. (Maple Leaf) appeals from a trial court order upholding the administrative determination by the Wisconsin Department of Natural Resources (DNR) under the Wisconsin Pollution Discharge Elimination System (WPDES). Specifically, Maple Leaf contends that the DNR has no authority to prescribe conditions under which it landspreads off-site manure generated from its duck-growing facilities. We affirm the decision of the circuit court, which upheld the DNR's authority to regulate Maple Leaf's landspreading of manure.

FACTS

¶ 2. Maple Leaf is the largest duck producer and processor in Wisconsin. It operates two duck-growing facilities in Racine County. The Downy Duck facility, located in the Town of Dover, houses 100,000 ducks and generates 34,000 tons of manure annually. The Main Farm, located in the Town of Yorkville, houses 250,200 ducks and generates 57,000 tons of manure annually. The operation of each of these facilities results in an actual or potential "discharge of pollutants" into the waters of the state within the meaning of WIS. STAT. § 283.01(5) (1999–2000).[1] Because of their size, both Downy Duck and Main Farm are "point sources" subject to the WPDES program, specifically as concentrated animal feeding operations (CAFO) within the meaning of § 283.01(12)(a). Both facilities are also large animal feeding operations within the meaning of WIS. ADMIN. CODE § NR 243.04(13).

¶ 3. The manure produced by Maple Leaf's duck operations is valuable as a nutrient supplement for agricultural crops. Some of the manure is applied on fields located on company property, but Maple Leaf also contracts with a number of farmers for land application of the waste. The off-site landspreading is undertaken by Maple Leaf. It transports the manure and applies the waste to the fields using a large piece of equipment called a terregator. The farmers pay Maple Leaf according to the quantity of manure that Maple Leaf applies to their fields.

¶ 4. On June 25, 1997, the DNR issued WPDES wastewater permits to Downy Duck and Main Farm. These permits require Maple Leaf to maintain runoff

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

control structures and to implement procedures for the storage and disposal of animal wastes, including an animal waste management plan. *See* Wis. Admin. Code §§ NR 243.13, 243.14. Maple Leaf sought and obtained a contested case hearing on numerous aspects of the two permits. On this appeal, Maple Leaf raises a single issue: the DNR's authority to regulate the land application of manure on off-site croplands.[2]

## STANDARD OF REVIEW

¶ 5. This court reviews the agency's decision rather than the decision of the circuit court. *Sea View Estates Beach Club, Inc. v. DNR*, 223 Wis. 2d 138, 145, 588 N.W.2d 667 (Ct. App. 1998). An agency's decision must be upheld when it is based on an accurate interpretation of the law and supported by substantial evidence in the record. Wis. Stat. § 227.57(5), (6). Courts apply one of three levels of deference to an agency's interpretation of a statute: great weight, due weight or de novo. *Secor v. LIRC*, 2000 WI App 11, ¶¶ 9–10, 232 Wis. 2d 519, 606 N.W.2d 175. The de novo standard applies if construction of the statute involves interpreting the scope of an agency's power. *Capoun Revocable Trust v. Ansari*, 2000 WI App 83, ¶ 6, 234 Wis. 2d 335, 610 N.W.2d 129. The parties agree that this appeal addresses the scope of the DNR's authority under the WPDES permit program. Therefore, we engage in a de novo analysis of the applicable law.

[2] We heard oral argument on April 24, 2001. In addition to the parties, we heard from amici curiae who had jointly filed a brief in favor of Maple Leaf's appeal. All of the amici parties are Wisconsin permit holders or have members who are permit holders. All such permit holders sell manure as fertilizer for off-site application.

## DISCUSSION

¶ 6. This case arises in the context of striking changes in the livestock production industries. "The character of livestock production in many parts of the world . . . is changing rapidly and dramatically. Economies of scale, specialization, and regional concentration in all major livestock production sectors have fueled a trend toward fewer, larger operations that confine thousands of animals on limited acreage." Larry C. Frarey and Staci J. Pratt, *Environmental Regulation of Livestock Production Operations,* 9 NAT. RESOURCES & ENV'T 8 (1995). Land disposal is the prevailing manure management strategy for most of these facilities. *Id.* at *11. Animal waste disposal is thus a prime concern in our state and across the nation. *See generally* J.B. Ruhl, *Farms, Their Environmental Harms, and Environmental Law,* 27 ECOLOGY L.Q. 263, 285–87 (2000).

¶ 7. According to expert testimony elicited at the administrative hearing, landspreading[3] manure improperly results in the release of pollutants to surface water or groundwater. If applied near streams, or on fields with drainage tile systems, runoff of pollutants into surface waters is likely. Soluble and fixed phosphorus can be carried away by surface water runoff and discharged into nearby surface waters. Runoff of phosphorus adds to the eutrophication of surface water, a condition where the dissolved nutrients stimulate excessive plant growth which can cause oxygen loss and subsequent harm to the fishery. When nitrogen leaches into groundwater, high levels of nitrate-nitrogen can make groundwater an unsafe source of drinking water.

---

[3] The term "landspreading" means the specific agricultural practice of applying wastes onto or into soil with mobile equipment such as a tanker truck or manure spreader.

¶ 8. To determine whether the DNR may regulate off-site manure applications, we first must determine if the exercise of such authority has been granted by the legislature. This requires the interpretation of the WPDES enabling statute contained in Wis. Stat. ch. 283. If the statute confers this authority, we must then look to Wis. Admin. Code ch. NR 243, which contains the rules governing animal waste management, to determine if these rules encompass off-site manure applications.

¶ 9. We preface our analysis with a brief review of the federal and state water pollution control programs. The federal Clean Water Act (CWA) prohibits the discharge of any pollutant by any person to navigable waters from any point source. 33 U.S.C. §§ 1311(a), 1362(12) (2000). "Pollutant" includes "solid waste" and "agricultural waste." *Id.* at § 1362(6). A "point source" includes "any discernible, confined and discrete conveyance" such as a ditch, channel or conduit, as well as any "concentrated animal feeding operation" (CAFO). *Id.* at § 1362(14). The CWA allows a point source to discharge pollutants only pursuant to the terms of a National Pollutant Discharge Elimination System (NPDES) permit. In contrast to most industrial and municipal point sources that discharge effluent under NPDES permits, CAFOs are subject to a "no discharge" effluent limitation.[4] Frarey & Pratt, *supra,* at *9. The "best available technology economically achievable" used by most CAFOs to satisfy the no discharge effluent limitation consists of one or more large lagoons or

---

[4] An effluent limitation is a measurement of pollutant discharge taken at the source. *Niagara of Wis. Paper Corp. v. DNR*, 84 Wis. 2d 32, 54, 268 N.W.2d 153 (1978).

holding ponds to capture storm water runoff and process generated wastewater. *Id.* at *10.

¶ 10. The CWA authorizes states to implement their own permit programs as long as the state programs impose standards at least as stringent as those of the federal program. *Niagara of Wis. Paper Corp. v. DNR*, 84 Wis. 2d 32, 38, 268 N.W.2d 153 (1978). The WPDES program differs from the CWA in two important respects. First, it defines waters of the state, which are subject to regulatory protection, to include groundwater, WIS. STAT. § 283.01(20), whereas waters of the United States, as defined in 40 C.F.R. § 122.2 (2001), do not include groundwater. *Vill. of Oconomowoc Lake v. Dayton Hudson Corp.*, 24 F.3d 962, 965 (7th Cir. 1994) (congressional decision to exclude groundwater from CWA based upon complex jurisdictional issues). Second, the Wisconsin legislature has authorized the DNR to establish more stringent effluent limitations if necessary to meet water quality standards. WIS. STAT. § 283.13(5).

¶ 11. According to Maple Leaf, a key provision of the enabling statute is the uniformity provision contained in WIS. STAT. § 283.11(2):

> [A]ll rules promulgated by the [DNR] under this chapter as they relate to point source discharges, effluent limitations, municipal monitoring requirements, standards of performance for new sources, toxic effluent standards or prohibitions and pretreatment standards shall comply with and not exceed the requirements of the [CWA] and regulations adopted under that act.

Maple Leaf asserts that because the federal program does not regulate off-site manure spreading,[5] the uniformity provision effectively eliminates the DNR's authority to impose permit conditions on this activity.

¶ 12. The DNR asserts that its authority to regulate this activity originates in a broad delegation of power enunciated in WIS. STAT. § 283.001, and its authority to condition permits on compliance with groundwater protection standards under WIS. STAT. § 283.31. The DNR further asserts that the uniformity provision is not applicable to permit conditions that are neither standards nor effluent limitations per se. We now turn the discussion to the legislation that establishes the WPDES program.

¶ 13. "An administrative agency has only those powers which are expressly conferred or can be fairly implied from the statutes under which it operates." *Oneida County v. Converse*, 180 Wis. 2d 120, 125, 508 N.W.2d 416 (1993). WISCONSIN STAT. ch. 283 does not expressly authorize the DNR to regulate off-site manure applications; therefore, we must determine whether such regulatory power is fairly implied from the language of the statute. "Any reasonable doubt as to the existence of an implied power in an agency should be resolved against the exercise of such authority."

---

[5] The DNR does not dispute that off-site manure applications are exempt from the NPDES program. *See Guide Manual on NPDES Regulations for Concentrated Animal Feeding Operations*, EPA 833–B–95–001 (December 1995), issued by the United States Environmental Protection Agency ("[T]he CWA does not regulate manure spreading once the manure leaves the property where it was generated. The CAFO . . . is only responsible for complying with NPDES permit requirements relative to any manure spreading on-site.").

*Kimberly-Clark Corp. v. PSC*, 110 Wis. 2d 455, 462, 329 N.W.2d 143 (1983). Furthermore, in construing a statute, the main goal is to discern the intent of the legislature and give it effect. *State ex rel. Frederick v. McCaughtry*, 173 Wis. 2d 222, 225, 496 N.W.2d 177 (Ct. App. 1992). We first look to the plain language of the statute; only if it is ambiguous do we turn to extrinsic aids such as legislative history. *State ex rel. Dieckhoff v. Severson*, 145 Wis. 2d 180, 189–90, 426 N.W.2d 71 (Ct. App. 1988).

¶ 14. WISCONSIN STAT. § 283.001(1) sets forth the policy and purpose of Wisconsin's WPDES program. It recognizes that

> [u]nabated pollution of the waters of this state continues to . . . endanger public health; to threaten fish and aquatic life, scenic and ecological values; and to limit the domestic, municipal, recreational, industrial, agricultural and other uses of water. It is the policy of this state to restore and maintain the chemical, physical, and biological integrity of its waters to protect public health, safeguard fish and aquatic life and scenic and ecological values, and to enhance the domestic, municipal, recreational, industrial, agricultural, and other uses of water.

¶ 15. The legislature granted the DNR "all authority necessary to establish, administer and maintain a state pollutant discharge elimination system to effectuate the policy set forth under sub. (1) and consistent with all the requirements of the federal water pollution control act." WIS. STAT. § 283.001(2). This broad grant of power authorizes the DNR to implement a permit program that protects groundwater as well as surface water. As we noted previously, in this respect, the state regulatory program is broader and more stringent than the federal program. This far-reaching power comple-

ments the DNR's broad regulatory power to protect waters of the state in other legislative enactments as well.[6] Reading § 283.001(1) and (2) together, we find that the enabling statute clearly and unambiguously empowers the DNR to regulate where groundwater may be affected by the discharge of pollutants. We perceive no implication that the legislature intended to limit the DNR's authority to protect waters of the state to discharges of pollutants occurring on sites owned by the discharger.[7]

---

[6] For example, WIS. STAT. § 281.11 charges the DNR to "protect, maintain and improve the quality and management of the waters of the state, ground and surface, public and private. . . . A comprehensive action program directed at all present and potential sources of water pollution whether home, farm, recreational, municipal, industrial or commercial is needed to protect human life and health . . . and domestic, municipal, recreational, industrial, agricultural and other uses of water." Similarly, WIS. STAT. § 281.12(1) grants the DNR "general supervision and control over the waters of the state. . . . The [DNR] also shall formulate plans and programs for the prevention and abatement of water pollution and for the maintenance and improvement of water quality."

[7] The amici parties assert that the DNR cannot rely on a statute's statement of purpose to confer authority on an agency. *See Rusk County Citizen Action Group, Inc. v. DNR*, 203 Wis. 2d 1, 9, 552 N.W.2d 110 (Ct. App. 1996). Their reliance on *Rusk* is misplaced. In *Rusk*, the court had to determine whether the statement of purpose in the Metallic Mining Reclamation Act authorized the DNR to ban all sulfide mineral mining in Wisconsin. The court observed that the statute required the DNR to establish standards and administer a permit application process to be implemented on a case-by-case basis. *Id.* at 8. The court concluded that a rule banning sulfide mineral mining would be inconsistent with the statute's permit program. *Id.* In distinguishing *Rusk* from the case before us, we note the obvious: the DNR is not seeking to ban all applications of

106

¶ 16. Maple Leaf asserts that the uniformity provision constricts the authority of the DNR to regulate off-site by providing that state rules "as they relate to point source discharges [and] effluent limitations . . . shall comply with and not exceed the requirements of the federal water pollution control act . . . and regulations adopted under that act." Wis. Stat. § 283.11(2). This provision appears in subchapter III entitled "Standards; Effluent Limitations." We agree with the position of the DNR that this provision applies only where the federal program regulates the activity in question, for example, where the EPA has imposed specific discharge limits for defined categories of industrial discharges and the DNR has superimposed more stringent limits. It would not apply where the federal government has chosen not to regulate at all.

¶ 17. In addition, all parties agreed at oral argument that the permit conditions are not effluent limitations for purposes of the exception to the uniformity provision contained in Wis. Stat. § 283.13(5) of subchapter III. If these permit conditions are not effluent limitations under the exception, then they cannot be effluent limitations for any other purpose under subchapter III, including the uniformity provision. The case law cited by Maple Leaf supports our interpretation.

¶ 18. In *Niagara of Wisconin Paper Corp.*, 84 Wis. 2d at 39–40, the EPA established specific phosphorus effluent standards for paper mills nationwide which

---

manure on off-site croplands. Indeed, if it were we would have to agree with the court in *Rusk* that the statement of purpose cannot be read to empower the DNR to ban all activities that might adversely affect water quality. *Id*. at 10. Instead, the DNR is seeking to provide a permit upon meeting conditions imposed by it under its statutory authority.

were less stringent than the standards contained in permits the DNR had previously issued to Wisconsin paper producers. The court ruled that the DNR was required to modify the permits to conform to the phosphorus standards established by the EPA. *Id.* at 56–57. Maple Leaf has not presented us with any similar EPA categorical standards or limitations that are applicable in this case.

¶ 19. The other case cited by Maple Leaf, *Wisconsin Electric Power Co. v. DNR*, 93 Wis. 2d 222, 287 N.W.2d 113 (1980), also involved a categorical effluent limitation. That case involved challenges to chlorine limits in wastewater discharge permits issued to a Wisconsin utility for discharges from its power plants. The court held that the limits were de facto rules, although they had not been formally promulgated. *Id.* at 240. Because the state chlorine limits were more stringent than the federal limits, the court held that the permits violated the uniformity provision. *Id.* at 242–43.

¶ 20. Maple Leaf's uniformity argument is most compelling for end-of-pipe discharges where the EPA imposes specific discharge limits from defined categories of pollution sources, such as paper mills and power plants. It is not as compelling in this instance where the federal government has chosen not to regulate and where the permit conditions involve not effluent limitations per se but rather preventive environmental practices, including maintenance of a manure management plan, a daily log and an annual spreading report. Therefore, we conclude that in the context of regulating a CAFO's manure applications, the broad grant of authority contained in WIS. STAT. § 283.001(2) is not limited by WIS. STAT. § 283.11(2).

¶ 21. Having concluded that the uniformity provision is not relevant to our statutory analysis, we must now consider whether the DNR's authority in Wis. Stat. § 283.001(2) can be harmonized with Wis. Stat. § 283.31 for conferring authority to regulate off-site applications of manure. Section 283.31 is found in subchapter IV entitled "Permits" and contains the following relevant language:

**283.31 Water pollutant discharge elimination system; permits, terms and conditions. (1)** The discharge of any pollutant into any waters of the state . . . by any person is unlawful unless such discharge . . . is done under a permit issued by the department under this section. . . .

. . . .

**(3)** The department may issue a permit under this section for the discharge of any pollutant . . . upon condition that such discharges will meet all the following, whenever applicable:

(a) Effluent limitations.

(b) Standards of performance for new sources.

(c) Effluent standards, effluent prohibitions and pretreatment standards.

(d) Any more stringent limitations, including those:

1. Necessary to meet federal or state water quality standards, or schedules of compliance established by the department . . . .

. . . .

(f) Groundwater protection standards established under ch. 160.

109

**(4)** The department shall prescribe conditions for permits issued under this section to assure compliance with the requirements of sub. (3)....

¶ 22. Looking at WIS. STAT. § 283.31(1), the first sentence explicitly states that if a person discharges any pollutant into waters of the state, such discharge will be unlawful unless it is done in compliance with a permit. WISCONSIN STAT. § 283.01(5) defines "discharge of pollutants" as the addition of any pollutant to the waters of this state from any point source. Section 283.01(12) states that a "point source" means either of the following:

(a) A discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, *concentrated animal feeding operation* . . . from which pollutants may be discharged . . . into the waters of the state . . . .

(b) A discernable, confined and discrete conveyance of storm water for which a permit is required under s. 283.33(1). (Emphasis added.)

¶ 23. Maple Leaf does not challenge that it is a concentrated animal feeding operation and therefore a point source subject to the permit requirements of WIS. STAT. § 283.31. Moreover, Maple Leaf does not challenge the DNR's authority under this statute to regulate its spreading of manure on land that it owns. We understand Maple Leaf to argue that this statute cannot be used to authorize the DNR to issue a permit regulating manure applications to off-site croplands. The plain language of the statute does not distinguish between discharges that occur off-site or on-site. The statute's focus is on whether there is a discharge from a point source to waters of the state. We focus our inquiry

110

therefore on whether landspreading of manure off-site is a discharge to waters of the state by Maple Leaf. If we conclude that it is not, then the DNR has no authority under the statute to regulate this activity by permit.

¶ 24. There is no Wisconsin case which has analyzed landspreading practices under the WPDES permit program. In *Concerned Area Residents for the Environment v. Southview Farm*, 34 F.3d 114 (2nd Cir. 1994), the Second Circuit held that the entire farm of a large dairy, not just the barns and pens, was a point source requiring an NPDES permit. Moreover, the Second Circuit ruled that the dairy's method of applying animal manure to its farmlands was a point source because the manure spreaders themselves were point sources. *Id.* at 119. Refusing to apply the CWA's exemption for agricultural storm water discharge, the court determined that any other result would allow farmers to get away with spreading animal waste on fields without regard for absorption capacity or runoff potential. *See id.* at 120–21.

¶ 25. Similarly, in *Community Ass'n for Restoration of the Environment v. Henry Bosma Dairy*, 65 F. Supp. 2d 1129 (E.D. Wash. 1999), the district court held that wastes removed from NPDES-regulated manure holding ponds and spread on land as fertilizer remain subject to the continuing jurisdiction of the NPDES permit. *See id.* at 1155. As a result of *Bosma*, noncompliance with a permit's waste management practices that results in discharges of runoff from manure laden fields is illegal.

¶ 26. We find these cases helpful to our determination of whether Wis. Stat. § 283.31 authorizes the DNR to issue permits that encompass manure applications to off-site croplands. We agree with the courts in *Bosma* and *Southview Farm* that a CAFO includes not

111

only the ground where the animals are confined, but also the equipment that distributes and/or applies the animal waste produced at the confinement area to fields outside the confinement area. Any overapplication of manure by Maple Leaf through its landspreading activities would then be a discharge, either because of runoff to surface waters or percolation of pollutants to groundwater. Because the off-site croplands are used by Maple Leaf to dispose of waste produced at its on-site facility, the permit conditions imposed on Maple Leaf to enforce groundwater protection standards are as applicable to Maple Leaf's off-site landspreading operations as they are on-site. Therefore, because a CAFO's overapplication of manure to fields can be a discharge to groundwater under the statute, we determine that the DNR has authority to issue permits regulating Maple Leaf's off-site landspreading operations.

¶ 27. Under our analysis of WIS. STAT. §§ 283.001 and 283.31, we conclude that the legislature has conferred authority on the DNR to regulate discharges, in the form of overapplication of manure, by CAFOs regardless of whether the discharge occurs on land owned by the CAFO. We now must determine if WIS. ADMIN. CODE ch. NR 243, governing animal waste management practices, implements this authority.

¶ 28. We begin by examining the purpose of the animal waste management regulation. "The purpose of this chapter is to establish design standards and accepted animal waste management practices for the large animal feeding operations category of point sources." WIS. ADMIN. CODE § NR 243.01(1). Subsection (2) provides that "[o]nly those animal feeding operations which improperly manage their wastes and as a result cause ground or surface water pollution, or those subject to the requirements for large animal feeding

112

operations will be regulated under this code." WISCONSIN ADMIN. CODE § NR 243.02 further states that this chapter applies to discharges of pollutants resulting from large animal feeding operations within the subcategories specified in § NR 243.11, Table 2. There is no question that Maple Leaf qualifies as a large animal feeding operation category of point source under these provisions and is therefore subject to the permitting requirements contained in the chapter. Like the enabling statute, these provisions are not concerned with where the discharge occurs with respect to its off-site or on-site location.

¶ 29. Subchapter II of the regulation requires an owner or operator of a large animal feeding operation to apply for a permit with the DNR. As part of the permit process, the applicant is required to submit an animal waste management plan for approval. In approving the management plan, the DNR is required to consider the following factors:

1. Potential impacts on waters of the state due to overapplication of the animal wastes.

2. Soil limitations such as permeability, infiltration rate, drainage class and flooding hazard.

3. Volume and water content of the waste material.

4. Available storage capacity and method of application.

5. Nutrient requirements of the crop or crops to be grown on the fields utilizing the animal wastes.

WIS. ADMIN. CODE § NR 243.14(2)(a). The DNR views these measures as creating a pollution prevention pro-

gram with respect to large animal feeding operations. We agree with the DNR that the effect of these measures is to require permit holders to implement sound environmental practices as a means to enforce compliance with surface and groundwater standards. *See* WIS. STAT. § 283.31(3)(f) (conditioning issuance of permits on compliance with groundwater protection standards established by DNR). In other words, the information sought by the DNR in the waste management plan is the basis for preventing overapplication of manure. Notably, the plain language of § NR 243.14(2)(a)1 requires the DNR to consider the "[p]otential impacts on waters of the state due to overapplication" and does not distinguish between on-site and off-site activities. In the same vein, § NR 243.14(2)(a)5 refers generically to fields utilizing the animal wastes; there is no distinction made with respect to where the fields are located or who owns them. This reinforces our interpretation of the regulations that the permit conditions may encompass a permit holder's landspreading activities whether they occur on-site or off-site.

¶ 30. Maple Leaf and the amici curiae argue that even if the DNR has authority to impose permit conditions for off-site manure applications, it must do so by promulgating specific permit conditions by rule pursuant to WIS. STAT. ch. 227. *See Wis. Elec. Power Co.*, 93 Wis. 2d at 236 (finding chlorine limitations contained in WPDES permits to be de facto rules requiring formal rulemaking). We find no merit in this position. In *Wisconsin Electric Power Co.*, the DNR had imposed chlorine limitations in permits issued to power companies. These chlorine limitations were industrial point source effluent limitations which the legislature had

explicitly directed must be promulgated by rule.[8] This case, as we have already explained, involves general reporting requirements rather than effluent limitations. Moreover, while WIS. STAT. § 283.31(4) directs the DNR to prescribe conditions for permits to assure compliance with water quality standards, the statute does not require the DNR to promulgate such conditions by rule.

¶ 31. Maple Leaf appears to argue that all permit language must be formally promulgated by rule. Carrying this logic further would result in a situation where permit writers could include in permits only restatements of the precise language contained in the administrative code. This would make the issuance of permits an untimely, cumbersome and inflexible exercise that would not benefit permit holders at all. It makes more sense that the legislature would allow the DNR flexibility in drafting conditions in permits. This allows the DNR to work individually with permit holders to fashion permits that more closely balance the specific needs of the permit holder with public environmental concerns.

¶ 32. In fact, the record reveals that Maple Leaf received the benefit of such flexibility in its permits. While most permit holders are required to submit additional spreading sites to the DNR for approval, Maple Leaf is allowed to use a new site seven days after the DNR receives its request if the DNR has not

---

[8] WISCONSIN STAT. § 283.11(1) provides in part:

> The department shall promulgate by rule effluent limitations, standards of performance for new sources, toxic effluent standards or prohibitions . . . for any category or class of point sources established by the U.S. environmental protection agency and for which that agency has promulgated any effluent limitations . . . .

responded within the seven-day time frame. The testimony before the ALJ established that this was a concession by the DNR and no such specific turn-around time is in similar permits issued by the DNR. The ALJ reduced this turn-around time even further, to three days. This unusually beneficial term belies Maple Leaf's assertion that permit conditions should be formally promulgated by rule.

¶ 33. In any event, we agree with the DNR that the conditions that Maple Leaf objects to are essentially restatements of the factors listed in WIS. ADMIN. CODE § NR 243.14(2) and the incorporated technical guidelines and other promulgated water quality and protection standards. We detect no language in the permit conditions that strays so far from the language or requirements of ch. NR 243 that the conditions can be considered new rules.

¶ 34. Maple Leaf's core issue concerns the requirement that it submit nutrient management plans for off-site applications. Nutrient management plans require Maple Leaf to report the quantity of manure to be spread, the nutrient needs of the crop and the corresponding nutrient content of the manure to be spread. This information insures manure application only at agronomic rates (i.e., no greater than the capacity of crops to utilize the nitrogen or phosphorus present in the manure applied). Maple Leaf and the amici curiae object to such burdensome conditions that call for extensive study, observations and reports required for lands other than the land they own. In particular, Maple Leaf points out that it has no control over the landowner's tillage practices, crop rotation, or application of other sources of fertilizer. Nevertheless,

as a CAFO under the WPDES program, Maple Leaf would be held liable for discharges that occur from overapplication of manure.

█

¶ 35. These issues raise serious policy concerns regarding the wisdom of the DNR's decision to hold Maple Leaf ultimately responsible for the manure it generates and applies off-site. We cannot rule, however, on the wisdom of an agency's decision. We simply must determine whether the DNR is empowered by the legislature to exercise its authority in this manner and we have concluded that it is. There is nothing in WIS. ADMIN. CODE ch. NR 243 which distinguishes between on-site and off-site landspreading activities. In either case, the purpose of the code is to prevent the discharge of pollutants to waters of the state. Furthermore, the WPDES statutory prohibition on discharges of pollutants from CAFOs would be of little value if the owners of the CAFOs could avoid responsibility merely by placing those pollutants onto the ground of third parties without regard to rates and quantities so that the pollutants would predictably leach into groundwater or runoff to surface waters. Our interpretation of the statute and regulation is consistent with the overall legislative goal to "restore and maintain the . . . integrity of [our state's] waters." WIS. STAT. § 283.001(1). The order affirming the agency's determination is affirmed.

*By the Court.*—Order affirmed.