WISCONSIN ELECTRIC POWER COMPANY, and others, Plaintiffs-Respondents, v. WISCONSIN NATURAL RESOURCES BOARD, and others, Defendants-Appellants. [Case No. 76–626.]†

WISCONSIN PUBLIC SERVICE CORPORATION, Plaintiff-Respondent, v. DEPARTMENT OF NATURAL RESOURCES, and others, Defendants-Appellants. [Case No. 76–627.]†

WISCONSIN POWER & LIGHT COMPANY, Plaintiff-Respondent, v. WISCONSIN NATURAL RESOURCES BOARD, and others, Defendants-Appellants. [Case No. 76–628.]†

Supreme Court

*Nos. 76–626, 76–627, 76–628. Submitted on briefs March 28, 1979. —Decided June 29, 1979.*
(Also reported in 280 N.W.2d 218.)

† Motions for reconsideration denied, without costs, on August 27, 1979.

For the appellants the cause was submitted on the briefs of *Bronson C. La Follette,* attorney general, and *William D. Bussey,* assistant attorney general.

For respondents there was a joint brief by *Eugene O. Gehl, Griffin G. Dorschel* and *Axley, Brynelson, Herrick & Gehl* of Madison, for Wisconsin Power and Light Company; by *Allen W. Williams, Jr.,* and *Foley & Lardner* of Milwaukee, for Public Service Corporation; and by *W. Stuart Parsons, Andrew M. Barnes* and *Quarles & Brady* of Milwaukee, for Wisconsin Electric Power Company and Wisconsin Michigan Power Company.

DAY, J. This is an appeal from a judgment of the circuit court for Dane County, the Honorable William C. Sachtjen presiding, entered in the above consolidated actions declaring secs. NR 102.05 (1) and NR 102.02 (3) (b), Wisconsin Administrative Code, to be invalid. The

court granted summary judgment in favor of Wisconsin Electric Power Company, Wisconsin Public Service Corporation, and Wisconsin Power and Light Company, and against the Department of Natural Resources. The three actions were commenced on November 17, 1975, December 3, 1975, and January 2, 1976, respectively, and were consolidated by order of the court. The judgment was entered on April 11, 1977.

The questions on appeal are:

1. Do NR 102.02(3)(b) and NR 102.05(1)—which pertain to thermal standards for Wisconsin lakes and streams—exceed the statutory authority of the State of Wisconsin Department of Natural Resources because they constitute thermal effluent limitations and are more stringent than federal effluent limitations, in violation of sec. 147.021, Stats. (1975)?

2. Does NR 102.05(1), insofar as it requires thermal discharges not to raise the receiving water temperature more than 3° F. above the existing natural temperature at the boundary of an established mixing zone, deprive the power companies affected of property without due process of law?

In 1971 the DNR adopted a rule, the former sec. NR 102.04(2)(b), Wisconsin Administrative Code, requiring dischargers of substantial amounts of heated water into Lake Michigan to conduct investigations and studies of the environmental and ecological impacts of such discharges, which were to provide a basis for determining what restrictions should be placed upon them. By July, 1974, the studies had been completed, and the Natural Resources Board scheduled a special meeting of its Environmental Quality Committee to consider them. There were six such studies to be considered, namely studies for WEPCO's Oak Creek, Lakeside and Point Beach Power Plants; studies for WPSC's Pulliam and Kewaunee Plants; and a study for WPL's Edgewater Plant.

On August 16, 1974, the Board's Environmental Quality Committee held a special meeting to consider the studies, at which it heard presentations from representatives of the respondents, Department staff, and others regarding the studies and alternative courses of action which the Board could take in responding to them. Further consideration of the studies and alternatives for Board action was undertaken by the Environmental Quality Committee, and the Board on August 23, 1974. At this meeting the Board adopted an alternative which provided that thermal discharges could not raise the temperature of the receiving water more that 3° F. above the existing natural temperature at the boundary of a mixing zone consisting of a defined area equivalent to that of a circle of 1,000 foot radius, unless the discharger could demonstrate to the Department that the mixing zone was more stringent than necessary to assure the protection and propagation of a balanced indigenous population of aquatic life and wildlife in the receiving water. This alternative was subsequently put in the form of a proposed rule, NR 102.05, and a public hearing on the rule was held before a hearing examiner of the Department on October 24, 1974.

On October 8, 1974 the federal Environmental Protection Agency reversed an earlier position regarding thermal mixing zones and promulgated regulations pursuant to the Federal Water Pollution Control Act Amendments of 1972 ("FWPCAA"), P.L. 92–500, 33 USCA §1251 et. seq., exempting all power plants of the age and size of the plants here involved from thermal discharge limitations, 40 CFR Part 423. The preamble to the regulations reported that the exemption was based upon a determination that such units cannot economically be re-equipped to control thermal discharge. 39 F. Reg. 36187 et seq.

On November 20, 1974, the DNR, at the request of plaintiffs, held a special hearing to further consider proposed NR 102.05 in light of the EPA regulation. At this meeting the Board heard presentations from representatives of respondents, Department staff, and others regarding this development and how the Board should respond to it. After further deliberations by the Environmental Quality Committee and the DNR on November 21 and 22, 1974, the DNR voted to adopt NR 102.05 as proposed. The rule was published in the Administrative Register and became effective August 1, 1975. Though the alternative adopted by the DNR was initially drafted as a single section of the Wisconsin Administrative Code—namely, NR 102.05—it was actually promulgated and published as two sections—namely, NR 102.05 and NR 102.07. As required by sec. 303(c) of FWPCAA these rules were submitted to and approved by the Environmental Protection Agency.

DO NR 102.02(3)(b) AND NR 102.05(1)—WHICH PERTAIN TO THERMAL STANDARDS FOR WISCONSIN LAKES AND STREAMS—EXCEED THE STATUTORY AUTHORITY OF THE STATE OF WISCONSIN DEPARTMENT OF NATURAL RESOURCES BECAUSE THEY CONSTITUTE THERMAL EFFLUENT LIMITATIONS AND ARE MORE STRINGENT THAN FEDERAL EFFLUENT LIMITATIONS, IN VIOLATION OF SEC. 147.021, STATS. (1975)?

The contested sections of DNR's rules read as follows:

NR 102.02(3)(b):
"(3) *Standards For Fish And Aquatic Life.* Except for natural conditions, all waters classified for fish and aquatic life shall meet the following criteria:
"(a) Dissolved oxygen: Except for waters classified as trout streams in Wisconsin Trout Streams, Publication

213–72, the dissolved oxygen content in surface waters shall not be lowered to less than 5 mg/1 at any time.

"(b) Temperature: 1. There shall be no temperature changes that may adversely affect aquatic life.

"2. Natural daily and seasonal temperature fluctuations shall be maintained.

"3. The maximum temperature rise at the edge of the mixing zone above the existing natural temperature shall not exceed 5° F. for streams and 3° F. for lakes.

"4. The temperature shall not exceed 89° F. for warm water fish."

"NR 102.05. *Lake Michigan And Lake Superior Thermal Standards.* For Lake Michigan and Lake Superior the following thermal standards are established so as to minimize effects on the aquatic biota in the receiving waters.

"(1) (a) Thermal discharges shall not raise the receiving water temperature more than 3° F. above the existing natural temperature at the boundary of mixing zones established in paragraphs (b) and (c).

"(b) 1. The mixing zone for a shoreline thermal discharge shall be the area included within the perimeter of a rectangular figure extending 1,250 feet in both directions along the shoreline from the outfall and 1,250 feet into the lake.

"2. The mixing zone for an offshore thermal discharge shall be the area within a 1,000 foot radius circle with its center at the point of discharge.

"(c) The department may, upon request from the owner of a source of thermal discharge, adjust the boundaries of the mixing zone established in paragraph (b) for that source. In no case may any mixing zone so established include an area greater than 72 acres nor may it include more than 2,800 feet of shoreline."

Before it was amended in 1972, the FWPCAA employed ambient water quality standards[1] as the primary method of controlling water pollution. "Under that pro-

---

[1] Ambient water quality standards, as opposed to discharge standards, specify only permissible levels of pollution in a given body of water. *See* Comment, The Federal Water Pollution Control Act Amendments of 1972. 1973 Wis. L. Rev. 893.

gram, if wastes discharged into receiving waters reduced the quality below permissible standards, legal action could be commenced against the discharger." *CPC International, Inc. v. Train,* 515 F.2d 1032, 1034–35 (8th Cir. 1975). In response to this federal program, Wisconsin adopted sec. 144.025, Stats. (1971) which authorized the Department of Natural Resources to: (1) ". . . formulate plans and programs for the prevention and abatement of water pollution and for the maintenance and improvement of water quality," and (2) ". . . to adopt rules setting standards of water quality to be applicable to the waters of the state. . . ." Sec. 144.025 (2) (a) and (b).

Dissatisfaction nationally with this water quality standard-based program stemmed from the facts that (1) standards relying on the assimilative capacities of receiving waters are of necessity imprecise, and (2) that enforcement of ambient standards is hampered by the difficulty of proving that a particular source was responsible for a violation of those standards. P.L. 92–500, *U. S. Code Cong. & Ad. News,* 92d Congress, 2nd Sess.

As the court stated in *CPC International, Inc. v. Train, supra,* 515 F.2d at 1034–35, the 1972 amendments to the FWPCA were enacted "against a background of frustration and ineffectiveness in controlling the quality of the nation's waters:"

"The keystone of the pre-1972 program had been the setting of 'water quality standards' for interstate navigable waters. Under that program, if wastes discharged into receiving waters reduced the quality below permissible standards, legal action could be commenced against the discharger. To establish that a given polluter had violated the federal legislation, a plaintiff had to cross a virtually unbridgeable causal gap by demonstrating that the cause of the unacceptable water quality was the effluent being discharged by the defendant. The enforcement mechanism of the prior legislation was so unwieldy that only one case had reached the courts in more than

two decades. See S. Rep. No. 92–414, 92d Cong., 1st Sess. (1971), reported in A Legislative History of the Water Pollution Control Act Amendments of 1972 at 1423 (1973), *U. S. Code Cong. & Admin. News,* 1972, p. 3668."

The FWPCA Amendments of 1972 abandoned reliance on ambient standards in favor of a comprehensive program based on "effluent limitations" which were aimed at particular point sources. Whereas the goal of the Act previously had been ". . . to enhance the quality and value of our water resources," the national goal under FWPCAA became the total *"elimination"* of discharge of pollutants by point sources into navigable waters by 1985. 33 U.S.C.A. §1251(a)(1). Water quality standards as established by the states under FWPCA were not abandoned, but Congress made it clear that they were no longer to be the primary enforcement tool:

"Under this Act the basis of pollution prevention and elimination will be the application of effluent limitations. Water quality will be a measure of program effectiveness and performance, not a means of elimination and enforcement. *U. S. Code Cong. & Admin. News,* 3675"

The 1972 amendments provide that the discharge of any pollutant is unlawful unless it is in compliance with effluent limitations contained in a permit issued under the Act. Permits are to be issued by the Environmental Protection Agency, or by those states whose permit programs have been approved by the EPA. *CPC International, Inc. v. Train, supra,* 515 F.2d at 1035.

In response to FWPCAA, the Wisconsin legislature enacted ch. 147, Stats., entitled "Pollution Discharge Elimination." The statement of policy and purpose acknowledged lack of success in abating pollution of the waters of the state under the earlier programs, and adopted the national goal of complete elimination of discharge of pollutants by point sources into the waters of

the state by 1985. Sec. 147.01(1), Stats.[2] While not repealing the authority of DNR to maintain water quality standards under sec. 144.025 (see Savings Clause at sec. 147.27),[3] the legislature in sec. 147.01(2) expanded the powers of that agency to ". . . establish, administer and maintain a statute pollutant discharge elimination system . . ." to effectuate the policy of this new Act.

The FWPCAA made it clear that the states could establish more restrictive standards and limitations than required by the federal Act. 33 U.S.C.A. §1370. The Wisconsin legislature, however, has explicitly limited the authority of the DNR in this regard:

"All rules adopted by the department pursuant to this chapter as they relate to point source discharges, effluent

[2] "147.01. **Statement of policy and purpose.** (1) Although in recent years intensive efforts have been made toward the abatement of pollution of the waters of this state, pollution of these waters continues. Unabated pollution of the waters of this state continues to arouse widespread public concern. It continues to endanger public health; to threaten fish and aquatic life, scenic and ecological values; and to limit the domestic, municipal, recreational, industrial, agricultural and other uses of water. It is the policy of this state to restore and maintain the chemical, physical, and biological integrity of its waters to protect public health, safeguard fish and aquatic life and scenic and ecological values, and to enhance the domestic municipal, recreational, industrial, agricultural, and other uses of water. In order to achieve this policy, the legislature declares that:

"(a) It is the goal of the state of Wisconsin to eliminate the discharge of pollutants into the waters of the state by 1985;

"(b) It is also the goal of the state of Wisconsin that, wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by 1983;

"(c) It is also the policy of the state of Wisconsin that the discharge of toxic pollutants in toxic amounts be prohibited."

[3] "147.27. **Savings clause.** Except as provided in this chapter, nothing in this chapter shall be deemed to supersede any other statute or session law."

limitations, water quality related limitations municipal monitoring regulations, standards of performance and toxic and pretreatment effluent standards *shall comply with and not exceed* the regulations of the federal water pollution control act amendments of 1972, P.L. 92–500, and regulations adopted pursuant thereto. (Emphasis added.) Wis. Stats. 147.021."

It is on the basis of this limitation in ch. 147 that the power companies contend that DNR overreached its authority in establishing NR 102.02(b)(3) and NR 102.05 (1) insofar as they pertain to thermal discharges from nuclear and steam-electric generating plants which came on line before January 1, 1970, as the plants in question did.

The process of generating electricity requires water within a closed system to be converted into steam by heat produced either by burning fossil fuel or by a nuclear reaction. The steam turns the electric turbines and then is condensed and converted back into steam so that the process may be repeated. Thermal pollution results if lake water is used to condense the boiler water by absorbing heat from the closed system and then is released back to its source at the much higher temperature. Comment, *Legal Aspects of Thermal Pollution,* 1969 Wis. L. Rev. 253, 254. "Heat" is included in the list of pollutants enumerated in both FWPCAA (33 USCA 1362(6) and ch. 147 Wis. Stats., s. 147.015(3)).[4]

Regulations promulgated by the federal Environmental Protection Agency under FWPCAA require all existing generating plants of 500 megawatts or more which come on line on or after January 1, 1970 to backfit closed-

[4] "Sec. 147.015, Stats. (1975). **Definitions.** . . . (3) 'Pollutant' means any dredged spoil, solid waste, incinerator residue, sewage, garbage, refuse, oil, sewage sludge, munitions, chemical wastes, biological materials, radioactive substance, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal and agricultural waste discharged into water."

cycle cooling systems to prevent the return of heated water to the receiving waters by July 1, 1981. 40 CFR 423. However, there is an exception from thermal discharge limitations for plants in the "old unit" category, defined as:

". . . any generating unit . . . of 500 megawatts or greater rated net generating capacity which was first placed in service on or before January 1, 1970 . . ." 40 CFR §423.11 and §423.31(b).

The guidelines for such "old units" do not contain any restriction on thermal pollution. 40 CFR §423.32 and 40 CFR §423.33. The EPA explained that the costs of retrofitting these older plants to control thermal pollution would outweigh the benefits.

"The cost, expressed in relation to power generated, is inversely related to the number of years of service life remaining for a particular generating unit. That is, the shorter the remaining useful life over which the cost of the cooling system may be amortized, the greater will be the percentage of the capital cost charges against each unit of power generated. Moreover, the shorter the remaining useful life, the less heat will be rejected to the environment particularly since many older units tradiionally operate only during periods of higher demand. Accordingly, the capital cost expressed as a function of units of heat removed will be greater for older plants.
"In addition, however, the absolute cost of retrofitting existing once-through units with closed-cycle cooling is substantially greater than is the cost of installing cooling equipment at new units." 39 F. Reg. 36188.

If rules in question are effluent limitations subject to ch. 147, as respondents contend, then they are invalid insofar as they pertain to respondent's plants since they exceed the regulations of the EPA regarding discharges from old units.

The DNR contends that NR 102.02(3)(b) and NR 102.05(1) are water quality standards promulgated un-

der ch. 144 Wis. Stats. Although the history of the federal water pollution control program shows that water quality standards and effluent limitations are not completely unrelated, the difference between the two is significant in terms of legal result.

In *Montgomery Environmental Coalition v. Fri*, 366 F. Supp. 261 (D. C. 1973), the court stated:

"The 1972 Act creates an enforcement policy built around specific effluent limitations as opposed to the water quality standards of the 1965 Act. A comparison of the two Acts indicates that water quality standards refer to maximum concentrations of pollutants in a body of water while effluent standards refer to absolute limitations on pollutants discharged from a particular source. The former are concerned with the quality of a water body in general while the latter emphasize the quality of a discharge source entering a water body."

The court noted that 33 U.S.C. sec. 1365(a)(1) restricted citizen suits under the Act to violations of effluent limitations. However, at the time of the filing of the suit, such limitations had not yet been promulgated. Nevertheless, the court concluded, for jurisdictional purposes, that

". . . water quality standards promulgated pursuant to the 1965 Act are to constitute a floor level of quality until the stiffer effluent limitations of the 1972 Act can be implemented. Consequently, the discharge of a pollutant which contributes to the violation of an existing water quality standard is clearly a violation of 33 USC §1311(a)." 366 F. Supp. at 265.

In *Bethlehem Steel v. Environmental Protection Agency*, 538 F.2d 513 (2d Cir. 1976), Bethlehem sought review of EPA's action partially approving New York's thermal water quality standards. Bethlehem was faced with the necessity of overcoming a jurisdictional hurdle because 33 U.S.C. Sec. 1369(b)(1) providing for review of certain actions of the EPA, did not mention approval

or disapproval of state water quality standards as one of the EPA actions that could be reviewed in the courts of appeals. The Second Circuit rejected Bethlehem's argument that the state water quality standards were actually effluent limitations, commenting, that "although water quality standards and effluent limitations are related . . . permitting effluent limitations to be based on water quality standards, the two are entirely different concepts and the difference is at the heart of the 1972 Amendments." *Id.* at 515.

The Court rejected Bethlehem's jurisdictional argument, and said:

"Although Bethlehem is correct that the Act does contemplate effluent limitations promulgated by the states, this does not mean that water quality standards, because they are initially issued by the states, must therefore be regarded as effluent limitations." *Id.* at 516.

In *United States Steel Corp. v. Train,* 556 F.2d 822, 840 (7th Cir. 1977), the court, citing *Bethlehem Steel Corp., supra,* recognized that while water quality standards are not necessarily effluent limitations, water quality standards can provide the basis for effluent limitations.

This court has recognized the distinction between water quality standards and effluent limitations, noting in *Niagara of Wis. Paper Corp. v. DNR,* 84 Wis.2d 32, 54, 268 N.W.2d 153 (1978), that effluent limitations measure the discharge of pollutants at the source, while water quality standards measure the quality of a given body of water without focusing on any single polluter.

In *Niagara of Wis. Paper Corp.,* the circuit court found that the phosphorous limitations contained in a discharge permit issued to the Fort Howard Paper Company, were void under sec. 147.021 because they were more strict than those mandated by the EPA.

On appeal, this court noted that sec. 147.02(3)(d)1 provides:

" '. . . (3) The department may issue a permit for the discharge of any pollutant, or combination of pollutants other than those prohibited under sub. (2), upon condition that such discharges will meet all the following, whenever applicable: . . . .
" '(d) *Any more stringent limitations* including those:
" '1. *Necessary to meet federal or state water quality standards. . . .'* (Emphasis added.)" *Niagara of Wis. Paper Corp., supra,* 84 Wis.2d at 53.

In that case, this court explicitly stated that "because sec. 147.02(3)(d)1, Stats., expressly allows for more stringent discharge permits which meet water quality standards, it appears that sec. 147.021 would not bar the inclusion of the phosphorous limitation in the WPDES [Wisconsin Pollution Discharge Elimination System] permit, if in fact, such limitation is a water quality standard." *Id.* at 53–54.

In *Niagara of Wis. Paper Corp.,* the court decided that the disputed rule[5] was, in fact, an effluent limitation, not a water quality standard. The court noted that the

[5] The rule, NR 102.04 read in pertinent part:
"Communities with a population of 2,500 and over in the lakes Michigan and Superior basins shall achieve an 85% reduction of phosphorous on an annual basis, and there shall be a commensurate removal from industrial wastes containing more than 2 mg/1 of total phosphorous and having an annual phosphorous discharge greater than 8,750 pounds. Any wastewater discharger— regardless of population, volume or type of waste discharge, or geographic location—may be required to remove excess amounts of phosphorous where such discharges are causing overfertilization of surface waters. A permit program is being initiated in accordance with the Federal Water Pollution Control Act Amendments of 1972 regarding treatment monitoring requirements for waste discharges to waters of the state. All industrial plants discharging wastes to surface waters are required to provide as a minimum, an effluent quality established in accordance with the Federal Water Pollution Control Act Amendments of 1972."

language of the rule explicitly referred to discharges, and thus the effluent limitation character of the section was apparent, given the references to the effluent requirements of the FWPCAA. In fact, the only part of the rule which referred to water quality was a reference to excess amounts of phosphorous where such discharges cause overfertilization of surface waters.

The court stated that "[i]f on remand the DNR can show that a phosphorous limitation is necessary to meet a water quality standard, such limitations may be imposed. Sec. 147.02(3)(d)1, Stats. It may not rely on an effluent limitation which is more stringent than the FWPCAA effluent limitations without linking it to a violation of an actual water quality standard."

The question then is, in the instant case, whether the disputed rules are water quality standards or effluent limitations.

We refer again to the language of *Niagara of Wis. Paper Corp., supra* at 54 in which we said: "A water quality standard is a measurement of the water itself and *it does not focus on any single pollutor* (sic) but necessarily comprehends all discharges into a given body of water." (Emphasis added.)

The wording of NR 102.02(3)(b) shows that the DNR's standard, based on degrees of temperature change at the edge of a mixing zone, is aimed at thermal discharges from particular point sources. A mixing zone is defined at NR 102.01(2) as:

". . . a region in which a discharge of different characteristics than the receiving water is in transit and progressively diluted from the source to the receiving stream."

While the definition alone does not indicate that mixing zones are established with reference to particular point

sources, other sections of the rule make it clear that this is the case. NR 102.05(1)(c), for example, indicates that:

". . . the Department may, upon request from the owner of a source of thermal discharge, adjust the boundaries of the mixing zone established . . . for that source . . ."

And NR 102.07(1), which establishes procedures for review of thermal standards, stated:

". . . (1) Whenever the owner of any source of thermal discharges that existed on or before July 31, 1975, in compliance with department guidelines and after opportunity for public hearing, can demonstrate to the satisfaction of the department that the mixing zone established pursuant to this chapter is more stringent than necessary to assure the protection and propagation of a balanced, indigenous population of shellfish, fish and wildlife in and on the receiving water, the department may:
"(a) Impose a mixing zone with respect to such thermal discharge that will assure the protection and propagation of such a population, or
"(b) Exempt such thermal discharge from the thermal requirements of this chapter provided this exemption will not endanger the propagation of such a population."

The effect of the mixing zone concept is that discharges from particular point sources will be identifiable, since one would naturally infer that a change of temperature at the very edge of a mixing zone that exceeded the maximum allowable change was caused by the discharge from that particular source. The DNR argues that the mixing zone concept is often used in water quality standards. This may be so; but when the effect is so clearly to allow the DNR to limit the amount of heat a given source can discharge, the conclusion must be that it is an effluent limitation, the purpose of which is to further the goal established in ch. 147, Stats.

Thus, we hold that the rules in question are invalid insofar as they exceed federal effluent limitations in violation of sec. 147.021, Stats. Because we base our holding on statutory grounds, it is unnecessary to address the constitutional question raised by the power companies.

*By the Court.*—Judgment affirmed.