Wisconsin Electric Power Company, Petitioner-Respondent, v. Department of Natural Resources, Defendant-Appellant.

Supreme Court

*No. 77–215. Argued November 5, 1979.—Decided January 8, 1980.*
(Also reported in 287 N.W.2d 113.)

For the appellant the cause was argued by *Raymond M. Roder,* assistant attorney general, with whom on the briefs was *Bronson C. La Follette,* attorney general.

For the respondent there was a brief by *Quarles & Brady,* attorneys, *Charles Q. Kamps, Andrew M. Barnes* and *Carol A. Curran,* Wisconsin Electric Power Company, of counsel, and oral argument by *Mr. Kamps,* all of Milwaukee.

CONNOR T. HANSEN, J. This case involves chlorine limitations set forth in Wisconsin Pollutant Discharge Elimination System (WPDES) permits issued by the DNR to Wisconsin Electric Power Company (Wisconsin Electric) for the discharge of pollutants from six of its power plants into various waters.

As required by sec. 147.02(1), Stats., Wisconsin Electric applied to the DNR for the permits.[1] Draft WPDES permits for Wisconsin Electric's plants were prepared by the DNR under the direction of Robert Chiesa, an environmental engineer in the Industrial Wastewater Section of the Bureau of Water Quality of the Division of Environmental Standards of the DNR. Chiesa was assisted in the preparation of the draft permits by Robert L. King, General Engineer with the Review and Evaluation Branch of the United States Environmental Protection Agency (EPA), Denver, Colorado. The chlorine limitations in those draft permits consisted of .2 mg/1 average and .5 mg/1 maximum free available chlorine, and the discharge of chlorine from each unit of each plant was limited to a maximum of one 2-hour period per day. Oliver D. Williams, Acting Administrator of the DNR, then transmitted the six draft permits and others to James O. MacDonald, Director of the Enforcement Division, Region V of the EPA. These draft permits all contained the above chlorine limitations. These proposed permit chlorine limitations were based upon EPA proposed effluent guidelines. The EPA proposed effluent guidelines were later promulgated as 40 C.F.R. 423.12 and 423.13, and Wisconsin Administrative Code sections NR 290.10 and 290.11.

A. H. Manzardo, Chief of the Permit Branch of Region V, EPA, responded to the Williams letter addressed to

[1] The application for permits concerned a number of power plants. However, this appeal is addressed only to the chlorine limitations contained in six specified permits.

MacDonald. In his response, Manzardo stated, among other things, that the chlorine limitations in the draft permits would not meet Wisconsin water quality standards. Citing sec. NR. 102.02(N) (d) [sic] and a paper by Dr. William Brungs of the EPA National Water Quality Laboratory in Duluth, Minnesota, Manzardo recommended that in areas receiving wastes treated continuously with chlorine, total residual chlorine should not exceed .01 mg/1 for the protection of more resistant organisms only, or exceed .002 mg/1 for the protection of most aquatic organisms. In areas receiving intermittently chlorinated wastes, total residual chlorine should not exceed .2 mg./1 for a period of two hours per day for more resistant species of fish, or exceed .04 mg/1 for a period of two hours per day for trout and salmon. Manzardo further stated that during the periods when plume temperatures exceed 70°F a .2 mg/1 total residual chlorine limit is appropriate even for trout and salmon since these fish would avoid the plume area. He concluded by stating "These levels would assure compliance with Wisconsin Water Quality Standards and should be imposed in the permits for power plants." The chlorine limitations set forth in the Manzardo letter were then incorporated in Wisconsin Electric's WPDES permits instead of the limitations in the EPA proposed effluent guidelines.

Application for the permits had been made on September 26, 1974, and on December 31, 1974, the DNR issued to Wisconsin Electric six WPDES permits, each one applicable to one of Wisconsin Electric's six power plants. The permits for Wisconsin Electric's Wells, Commerce and Valley power plants limit the discharge of total residual chlorine to .2 mg/1 per day. The Wells and Commerce plants discharge wastes into the Milwaukee river, and the Valley plant discharges into the South Menominee canal. The permits for the Lakeside, Oak Creek and Port Washington plants limit the discharge of total re-

sidual chlorine to .2 mg/1 per day when the temperature is 70°F and above, and to .04 mg/1 per day when the temperature is less than 70°F. These three plants all discharge wastes into Lake Michigan. The six permits further prohibit the discharge of free available chlorine or total residual chlorine for more than two hours in any one day.

The chlorine limits recommended by Manzardo were never submitted to the Natural Resources Board, the policy making agency, prior to their incorporation in Wisconsin Electric's permits. Although the DNR was aware of the Brungs paper referred to by Manzardo in his letter when preparing the draft permits, the DNR followed the chlorine limits of the EPA effluent guidelines. Thus the specific chlorine limits contained in the permits were never promulgated as a rule or an order. There was no general notice issued by the DNR of an intent to set effluent limitations for chlorine. Following the application for the permits, the DNR did give notice of its intent to issue the permits as required by sec. 147.10, Stats.

The decision of the DNR to use the Manzardo recommended chlorine limitations in the permits appears to be based upon the fact that the DNR expected the EPA to defend the validity of those chlorine limitations. The DNR had no general file regarding the appropriateness of chlorine limitations for power companies throughout the state, and had not made a study with respect to the chlorine limitations involved in the case. The DNR did not make an independent organized study of its own on the effect of chlorine in water, but relied on work done by the EPA and others. That reliance was not based upon a systematic, organized, in-depth review of the work done by others.

After the issuance of the permits, Wisconsin Electric petitioned the DNR for a public adjudicatory review hearing pursuant to sec. 147.20, Stats., to review, among

other things, the effluent limitations for chlorine set forth in the permits. Following the hearing the DNR made findings of fact and conclusions of law. The findings of fact relevant to this appeal are:

"7. The chlorine limitations in Part . . . of Permit No. . . . are derived from Sections NR 102.02(1) (d) and 102.02(3) (d) of the Wisconsin Administrative Code, as well as scientific data verifying the toxicity of chlorine to aquatic life at levels higher than authorized by the permit. Said limitations are reasonable and a valid exercise of authority by the Department of Natural Resources under Chapter 144 and 147, Wisconsin Statutes.

"8. Chlorine limitations such as the ones included in this permit have not been uniformly included in all permits issued by the Department of Natural Resources. Said limitations have been applied only to significant chlorine discharges which ultimately enter the waters of Lake Michigan. Said waters contain a population of salmonoid fish species which is especially intolerant of chlorine in its environment.

"9. The request of the petitioner that the chlorine limitations of the permit be modified because the procedures dictated by Section 147.05, Wisconsin Statutes, were not followed by the Department is unreasonable. Said procedures do not apply to implementation of water quality related effluent limitations pursuant to Section 147.04 (4) prior to July 1, 1983. Only if the application of 'best available technology economically achievable' for industrial point sources and 'best practicable waste treatment technology' for municipal sources is unsuccessful at achieving water quality standards, does the mechanism of Section 147.05 become necessary."

The DNR made the following conclusions of law:

"1. The Department of Natural Resources has authority pursuant to Sections 147.02(3) (d)1 and 147.04(4), Wisconsin Statutes, to impose a limitation in a WPDES permit which is more stringent than the technology based effluent limitations of Sections NR 290.10 and 290.11, Wisconsin Administrative Code, when necessary to meet federal or state water quality standards.

"2. Sections NR 102.02(1)(d) and 102.02(3)(d), Wisconsin Administrative Code, are validly promulgated water quality standards of the State of Wisconsin which prohibit the introduction into the waters of the state substances which are toxic or acutely harmful to aquatic life.

"3. The imposition of the chlorine effluent limitations in Permit No. . . . did not constitute the promulgation of a 'rule' within the meaning of Section 227.01(3), Wisconsin Statutes. Said limitations involved the application of a specific set of facts in a specific case in accordance with Section 227.01(4), Wisconsin Statutes. As such Section 147.021, Wisconsin Statutes, is not violated by the chlorine limitations in said permit.

"4. The imposition of water quality related chlorine limitations necessary to meet state water quality standards to be achieved by July 1, 1977 is not limited by Section 147.05, Wisconsin Statutes.

"5. In accordance with Section 147.20, Wisconsin Statutes and the foregoing Findings of Fact, the Department of Natural Resources has authority to modify Permit No. . . . in the manner prescribed in the order hereinafter set forth."

The DNR then ordered that all modifications to the permits requested by Wisconsin Electric relating to the chlorine limitations be denied with prejudice.

Wisconsin Electric then petitioned the circuit court for review of the department's order pursuant to sec. 227.15, Stats. On review, the circuit court held that the chlorine limitations contained in Wisconsin Electric's permits were not "rules" as defined in sec. 227.01(9), Stats. (formerly sec. 227.01(3)), but were in the nature of "orders" as defined in sec. 227.01(11)(c), Stats. (formerly sec. 227.01(5)(c)), and therefore, neither sec. 147.-021[2] nor sec. 147.05[3] was applicable. The court also

---

[2] Sec. 147.021, Stats., provides that state toxic and pretreatment effluent standards shall comply with and not exceed the requirements of the Federal Water Pollution Control Act amendments of 1972 P.L. 92–500.

[3] Sec. 147.05, Stats., sets forth the procedure for establishing water quality related limitations.

held that the DNR had complete authority to order Wisconsin Electric to limit its chlorine discharge by order under sec. 144.025 (2) (d) 1[4] and Wis. Adm. Code sec. NR 102.02 (1) (d),[5] but the DNR violated Wis. Adm. Code sec. NR 1.50 (3) (a),[6] since it imposed chlorine limitations upon Wisconsin Electric by "special order," but failed to serve a notice of hearing and to conduct a hearing before initiating those orders. The court further held that the hearing from which Wisconsin Electric appealed did not satisfy its required opportunity to be heard, since the findings of fact were overly broad and vague.

Judgment was thereupon entered and it was adjudged that the chlorine limitations specified in the orders of the Wisconsin Department of Natural Resources dated August 30, 1976, in the matter of a public adjudicatory hearing to review Wisconsin Electric's six WPDES permits were invalid and ineffective, the orders were to that extent reversed, and the matter was remanded for further proceedings consistent with the memorandum decision.

We believe the issues in the case can be stated as follows:

1. Do the chlorine limitations contained in the WPDES permits issued to Wisconsin Electric constitute "rules" and, if so, do they violate sec. 147.021, Stats., or sec. 227.02 (1) ?

2. Are the chlorine limitations contained in the WPDES permits issued to Wisconsin Electric invalid because they are more stringent than the limitations found in Wis. Adm. Code ch. NR 290?

[4] Sec. 144.025 (2) (d)1, Stats., provides for the issuance of special orders directed to owners under ch. 144 which relate to control of water, ice, sewage and refuse.

[5] Wis. Adm. Code NR 102.02 (1) (d) is a general declaration that substances which are toxic or harmful to humans or acutely harmful to animal, plant or aquatic life shall not be present in waters of the state.

[6] Wis. Adm. Code NR 1.50 (3) (a) establishes the procedure for issuing special orders relating to water pollution.

3. Are the chlorine limitations contained in the WPDES permits issued to Wisconsin Electric "special orders" subject to the procedural requirements of Wis. Adm. Code sec. NR 1.50 (3) ?

4. Were the chlorine limitations adopted in violation of sec. 147.05, Stats. ?

5. Did the DNR violate sec. 227.09 (4), Stats. ?

## I.

The DNR contends that the chlorine limitations contained in the WPDES permits issued to Wisconsin Electric are not rules. Wisconsin Electric, on the other hand, contends that those chlorine limitations are rules and they are invalid because they were not adopted in accordance with sec. 227.02 (1), Stats., and they violate sec. 147.021.

The term "rule" is defined in sec. 227.01 (3), Stats. 1973 (presently sec. 227.01 (9) ), as follows:

*"(3)* 'Rule' means a regulation, standard, statement of policy or general order (including the amendment or repeal of any of the foregoing), of general application and having the effect of law, issued by an agency to implement, interpret or make specific legislation enforced or administered by such agency or to govern the organization or procedure of such agency."

In addition, sec. 227.01 (4), Stats. 1973 (presently sec. 227.01 (10) ), provides:

*"(4)* Every statement of general policy and every interpretation of a statute specifically adopted by an agency to govern its enforcement or administration of legislation shall be issued by it and filed as a rule. The fact that a statement of policy or an interpretation of a statute is made in the decision of a case or in an agency decision upon or disposition of a particular matter as applied to a specific set of facts involved does not render the same a rule within sub. (3) or constitute specific adoption thereof by the agency so as to be required to be issued and filed as provided in this subsection."

Thus, a rule for purposes of ch. 227, Stats., is (1) a regulation, standard, statement of policy or general order, (2) of general application, (3) having the effect of law, (4) issued by an agency, (5) to implement, interpret or make specific legislation enforced or administered by said agency as to govern the interpretation or procedure of such agency. *Citizens for Sensible Zoning, Inc. v. DNR,* 90 Wis.2d 804, 814, 280 N.W.2d 702 (1979).

Neither of the parties argues that the chlorine limitations contained in the permits fail to fulfill the first requirement. These limitations do constitute "regulations" or "standards."

The DNR argues that the chlorine limitations in the permits do not have general application, and supports its argument by quoting from the circuit court's memorandum decision, which states:

"In the situation before us, the DNR did not publish a basic policy regarding chlorine limitations in granting permits. A letter [the Manzardo letter] was received from the EPA recommending general limitations, which appear to be quite consistent with the specific limitations in the discharge permits. . . .
"The DNR then proceeded to place limitations into the petitioner's discharge permits. The permits applied specifically to the named applicant. Each was a product of separate considerations, and the chlorine limitations in each varied with the nature of the particular receiving waters. . . ."

The department hearing examiner also stated in his conclusions of law that the chlorine effluent limitations in the permits involved the application of a specific set of facts in a specific case and therefore were not rules as defined by sec. 227.01 (4), Stats.

The record reflects that the DNR drafted and sent to the EPA draft permits for 13 Wisconsin steam electric power plants. And in a letter to James MacDonald, Re-

gion V, EPA, dated August 21, 1974, Oliver Williams, of DNR, stated that the Department intended to issue WPDES permits to all 25 major power plants by December 31, 1974. In response to this letter, Manzardo sent a letter in which he initially urged that primary emphasis be placed upon the original major power plants, 15 in number, including the six plants at issue in this case. Manzardo further stated:

"Our staff review of major power plant draft permits submitted by your office show that in general they are of good quality and can be used as a basis for issuing public notices provided the following issues are addressed:

"1. . . . .

"2. *Total Chlorine Residual*

"We note also that the chlorine requirements in your draft permits would not meet Wisconsin Water Quality Standards. The limits you have used are those in the EPA Proposed Effluent Guidelines for Steam Electric Power Plants. These limits are based on generally available technology and would not protect fish and other aquatic life in the discharge area. Your Water Quality Standards [NR 102.02(N)(d)] [sic] require that substances within mixing zones not be acutely harmful to aquatic life. We have attached a copy of a paper by Dr. William Brungs of the EPA National Water Quality Laboratory in Duluth, Minnesota with the following recommendations:

"In areas receiving wastes treated continuously with chlorine, total residual chlorine should not exceed 0.01 mg/1 for the protection of more resistant organisms only, or exceed 0.002 mg/1 for the protection of most aquatic organisms.

"In areas receiving intermittently chlorinated wastes, total residual chlorine should not exceed 0.2 mg/1 for a period of 2 hr/day for more resistant species of fish, or exceed 0.04 mg/1 for a period of 2 hr/day for trout and salmon.

These levels would assure compliance with Wisconsin Water Quality Standards and should be imposed in the permits for power plants. We would like to note that

during the periods when plume temperatures exceed 70°F a 0.2 mg/1 total residual chlorine limit is appropriate even for trout and salmon waters since these fish will avoid the plume area."

Thus, there are four sets of limitations advocated by the Manzardo letter:

1. Waters receiving wastes treated continuously with chlorine having fish species that are sensitive to chlorine: not more than .002 mg/1 total residual chlorine;

2. Waters receiving wastes treated continuously with chlorine having fish species that are more resistant: not more than .01 mg/1 total residual chlorine;

3. Waters receiving wastes treated intermittently with chlorine having fish species that are sensitive to chlorine: not more than .04 mg/1 total residual chlorine for a period of 2 hours/day when the plume temperature is at or below 70°F, or not more than .2 mg/1 total residual chlorine for a period of 2 hours/day when the plume temperature is above 70°F; and

4. Waters receiving wastes treated intermittently with chlorine having fish species that are more resistant: not more than .2 mg/1 total residual chlorine for a period of 2 hours/day.

This letter makes it clear that these chlorine limitations were recommended to apply to all of the power plants for which draft permits were submitted to the EPA, and the DNR uniformly imposed these limitations in the WPDES permits issued to Wisconsin Electric. Also, Robert Chiesa testified that these chlorine limitations appear in all DNR permits issued to Wisconsin power companies, but the limitations in the permits differ depending on the characteristics of the receiving water and the type of aquatic organisms therein. The result is that the chlorine limitations which appear in one permit are not necessarily identical with limitations contained in

other permits because the Manzardo letter set forth the four different limitations. The limitations vary depending on the tolerance of aquatic organisms in the receiving water to chlorine and on the time period during which the water receives the chlorine. Uniform application of the Manzardo limitations does not mean that the chlorine limitations are always the same in each issued permit. In this case, the DNR uniformly applied the limitations to Wisconsin Electric's six power plants; the specific limitations in the permits differ because the receiving waters of the power plants differ. The chlorine limitations are therefore of general application within the meaning of sec. 227.01 (3), Stats.

The DNR further contends that the chlorine limitations do not have the effect of law because they were EPA recommendations and did not constitute official action of the DNR. It is true that the Manzardo letter itself does not have the force of law. However, the adoption and uniform application of recommendations for chlorine limitations contained in that letter and the placing of them in permits does constitute action by the DNR. The limitations were recommended by the EPA, but it was the DNR which imposed them through the WPDES permit program. And WPDES permits do have the force of law, since civil and criminal remedies are provided in sec. 147.21, Stats., for any violation of a term or condition of a WPDES permit.

Finally, the chlorine limitations were issued "to implement, interpret or make specific legislation enforced or administered by such agency or to govern the organization or procedure of such agency." Specifically, the DNR issued the permits containing the chlorine limitations to implement sec. 147.02, Stats., *Water pollution discharge elimination system; permits, terms and condi-*

*tions.* Thus, the chlorine limitations incorporated in the permits satisfy all of the requirements of a rule.

This court has addressed the issue of what constitutes an administrative rule on several occasions. In *Frankenthal v. Wisconsin R. E. Brokers' Board,* 3 Wis.2d 249, 88 N.W.2d 352, 89 N.W.2d 825 (1958), a partnership made a written application for renewal of its broker's license and set forth on its application that one of the partners was inactive and did not desire to act as a broker. The state real estate brokers' board, by letter, refused to issue a license to the partnership, and stated that it would be necessary for the inactive partner to qualify as a licensed real estate broker in order for the partnership to be licensed. Enclosed with the letter was a mimeographed sheet containing instructions regarding renewal of real estate licenses. These instructions stated that in case of a partnership all partners must be licensed as brokers. This requirement represented a change in the board's interpretation of sec. 136.07, Stats. Prior to this time, the board had interpreted the statute as permitting licensing of a partnership even though there were inactive partners who were not licensed. This court held that the issuance of the mimeographed instructions for renewal of real estate broker's licenses constituted administrative rule making. On motion for rehearing, the position of the court was reaffirmed and clarified:

"The particular mimeographed instruction under attack in this case was a 'statement of policy . . . of general application and having the effect of law, issued . . . to . . . interpret . . . legislation . . . administered by' the board. It does not fall within any of the exceptions stated in sec. 227.01(4) and (5), Stats. [Now sec. 227.-01(10) and (11), Stats.]

"When a party files an application for a license with an administrative agency and the latter points to some announced agency policy of general application as a reason for rejecting the application, such announced policy

constitutes a rule, the validity of which the applicant is entitled to have tested in a declaratory action instituted pursuant to sec. 227.05, Stats. However, if the application is rejected because of some ruling which is not applicable generally but is limited to the facts presented by applicant, then the situation is governed by the exception set forth in sec. 227.01 (4) and such a ruling does not constitute a 'rule' under ch. 227, Stats. The facts in the instant case clearly fall within the former category and not the latter." *Id.* at 257b.

In *Josam Mfg. Co. v. State Board of Health,* 26 Wis.2d 587, 133 N.W.2d 301 (1965), the state board of health issued a letter to all plumbers in Wisconsin retracting permission to utilize a particular type of plumbing fitting, which it considered unsatisfactory and in conflict with statutory and administrative code regulations. This court held that the letter constituted an administrative rule:

"The 'To Whom It May Concern' letter of July 3d is considered to be a rule. It was a statement of agency policy of general application. While it arose out of the 'Unitron case,' nothing appears to indicate that the policy expressed in the letter is limited to only Josam Unitron fittings. . . ." *Id.* at 595.

In *Schoolway Transp. Co. v. Div. of Motor Vehicles,* 72 Wis.2d 223, 240 N.W.2d 403 (1976), the department of transportation had issued dual licenses for Schoolway's busses, as well as for those of similarly situated companies, prior to 1971. These dual licenses were issued under special licensing statutes for school busses and the urban mass transportation of passengers, when such busses were to be used interchangeably for the transportation of school children and the performance of charter and contract work. Thereafter, the department requested advice from the attorney general in regard to its interpretation and application of sec. 341.26, Stats. Following the advice received, the department refused

to issue dual licenses for busses utilized for the two specified purposes.

This court held that the decision of the department to correct its erroneous interpretation of sec. 341.26(2)(da), the school bus special license statute, did not constitute rulemaking, stating,

"The facts of this case show that the Department has been allowing dual registration for a number of years. It is clear, however, that by allowing such dual registration, the Department acted outside of the authority conferred upon it by sec. 341.26(2)(d) and (da), Stats. The Department's revised application of these statutes served to bring its practices into conformity with the plain meaning of the statute, a course the Department was obliged to pursue when confronted with its error. . . .

". . . .

"This is not a regulation, standard, statement of policy or general order within the meaning of sec. 227.01(3), Stats., *supra*, and *Josam Mfg. Co. v. State Board of Health, supra*. Neither is it a statement of general policy or interpretation of a statute within the meaning of sec. 227.01(4), *supra*. . . ." *Id.* at 236.

However, the court held that when the department decided to change its interpretation and application of sec. 341.26(2)(h), the urban mass transportation special licensing statute, it was engaging in administrative rule making:

"The Department has also revised its interpretation of the urban mass transportation provisions of sec. 341.26 (2)(h), Stats., and will no longer permit Schoolway to register its busses for charter and contract work pursuant to the terms of that section. Since the terms of that section do not specifically exclude busses engaged in charter and contract work, the Department relies on the context of ch. 71 in which the definition of urban mass transportation is contained to reach its conclusion that Schoolway's busses do not qualify. This represents an interpretation of a statute within the meaning of sec. 227.-01(4). The interpretation is being administered as law

and the Department relies upon it to deny Schoolway a license under sec. 341.26(2)(h), as was the case in *Frankenthal, supra*. This interpretation is in direct contrast to the manner in which the statute was previously administered by the Department.

"In view of these considerations, when the Department changed its interpretation of sec. 341.26(2)(h), Stats., it was engaging in administrative rule making. . . ." *Id.* at 236, 237.

*See also: Citizens for Sensible Zoning, Inc. v. DNR,* 90 Wis.2d 804, 280 N.W.2d 702 (1979).

Section 227.01(5), Stats. 1973 (presently sec. 227.01(11)), excludes a number of actions by an administrative agency from the definition of rule:

"*(5)* 'Rule' as defined in sub. (3) does not include or mean, and the provisions of sub. (4) do not apply to, action or inaction of an agency, regardless of whether otherwise within sub. (3) or (4), which:

" . . . .

"(b) Is a decision or order in a contested case;

"(c) Is an order which is directed to a specifically named person or to a group of specifically named persons which does not constitute a general class, and the order is served on the person or persons to whom it is directed by the appropriate means applicable thereto. The fact that the named person who is being regulated serves a group of unnamed persons who will be affected does not make such order a 'rule';

" . . . ."

The chlorine limitations do not fall within any of these exclusions. Sec. 227.01(5)(b) excludes from the category of rules a decision or order in a contested case. "Contested case" is defined in sec. 227.01(2), as follows:

" . . . 'Contested case' means a proceeding before an agency in which, after hearing required by law, the legal rights, duties or privileges of any party to such proceeding are determined or directly affected by a decision or order in such proceeding and in which the assertion by one party of any such right, duty or privilege is denied or controverted by another party to such proceeding."

No hearing is required to be held before a WPDES permit is issued. The DNR must give public notice of each application for a permit pursuant to sec. 147.09, and certain persons may request a public hearing with respect to a permit application under sec. 147.13, but no hearing is "required by law." Furthermore, sec. 147.13 (1) (c) states in part, "Hearings held under this section are not contested cases under s. 227.01 (2)." Thus, the chlorine limitations do not fall within the exception stated in sec. 227.01 (5) (b).

The chlorine limitations also do not fall within the exception to a "rule" stated in sec. 227.01 (5) (c), Stats. These chlorine limitations are not "orders" directed to a group of specifically named persons, but are provisions of WPDES permits issued pursuant to ch. 147.

The department hearing examiner in this case concluded that since the imposition of the chlorine effluent limitations in the permits did not constitute the promulgation of a rule, sec. 147.021, Stats., is not violated by the chlorine limitations set forth in the permits. The trial court acknowledged that the permit limitations exceeded the federal requirements in relation to water quality related limitations, but held that the chlorine limitations are in the nature of orders, not rules, and, thus, sec. 147.-021 is not applicable. The DNR likewise acknowledges that the chlorine limitations imposed in the permits are more stringent than the effluent limitations contained in the applicable federal regulations. However, the DNR contends that the chlorine limitations in the permits are not rules and therefore the provisions of sec. 147.021 are inapplicable. Since we conclude the chlorine limits used in the permits do constitute rules, we believe it follows that the manner in which such limitations were imposed does violate sec. 147.021.

Sec. 147.021, Stats., provides:

*"147.021* **Compliance with federal standards.** All rules adopted by the department pursuant to this chapter as they relate to point source discharges, effluent limitations, water quality related limitations, municipal monitoring requirements, standards of performance and toxic and pretreatment effluent standards shall comply with and not exceed the requirements of the federal water pollution control act amendments of 1972, P.L. 92–500, and regulations adopted pursuant thereto."

The federal chlorine limitations for electric utilities are contained in 40 C.F.R. Part 423. 40 C.F.R. Part 423.13 states in part:

"(h) The quantity of pollutants discharged in once through cooling water shall not exceed the quantity determined by multiplying the flow of once through cooling water sources times the concentration listed in the following table:

| Effluent Characteristic | Maximum Concentration | Average Concentration |
|---|---|---|
| Free available chlorine. | 0.5 mg/1 . . . . . . . . . . | 0.2 mg/1 |

"(i) The quantity of pollutants discharged from cooling tower blowdown shall not exceed the quantity determined by multiplying the flow of cooling tower blowdown times the concentration listed in the following table:

| Effluent Characteristic | Maximum Concentration | Average Concentration |
|---|---|---|
| Free available chlorine. | 0.5 mg/1 . . . . . . . . . . | 0.2 mg/1 |

"

40 C.F.R. Part 423.11 defines "blowdown," "free available chlorine" and "once through cooling water":

" . . . .

"(e) The term 'blowdown' shall mean the minimum discharge of recirculating water for the purpose of discharging materials contained in the process, the further

buildup of which would cause concentrations or amounts exceeding limits established by best engineering practice.

"(f) The term 'free available chlorine' shall mean the value obtained using the amperometric titration method for free available chlorine described in 'Standard Methods for the Examination of Water and Wastewater,' page 112 (13th edition).

"...

"(k) The term 'once through cooling water' shall mean water passed through the main cooling condensers in one or two passes for the purpose of removing waste heat from the generating unit."

It is undisputed that the chlorine limitations contained in Wisconsin Electric's WPDES permits are more stringent than the limitations contained in these federal regulations. Therefore, the DNR violated sec. 147.021 by adopting these chlorine limitations.

This case is similar to *Niagara of Wis. Paper Corp. v. DNR*, 84 Wis.2d 32, 268 N.W.2d 153 (1978), which was decided since the instant case was before the trial court. That case involved two paper companies which had been issued WPDES permits by the DNR. The DNR issued interim effluent limitations applicable to the paper companies in February, 1974, and reissued substantially the same limitations in February, 1975. These were based on an EPA guidance document dated May, 1973. Interim final effluent limitations were published by the EPA in February, 1976. Final limitations were published in January, 1977, in 41 Fed. Reg. Identical limitations were adopted in Wisconsin as ch. NR 284 of the Wisconsin Administrative Code in February, 1977. The final effluent limitations were less stringent than the interim effluent limitations adopted by the DNR and outlined by the EPA in 1973.

In June and December, 1974, respectively, the DNR issued a WPDES permit to the two paper companies. These permits began under the interim effluent limita-

tions and overlapped into the interim final and final EPA standards. In August, and December, 1974, respectively, the paper companies petitioned the DNR for an adjudicatory hearing to review certain permit terms. In July, and January, 1976, respectively, the DNR affirmed the limitations in the permits. Both paper companies commenced an action in circuit court. In March, and August, 1977, respectively, the trial court in each case reversed the decision of the DNR and remanded for modifications of the permits in accordance with the EPA final limitations. This court affirmed the trial court in both bases, holding, among other things, that the permits violated sec. 147.021, Stats.

In this case, draft WPDES permits containing chlorine limitations based upon EPA proposed effluent guidelines were sent to the EPA on August 21, 1974. On August 28, 1974, Manzardo of the EPA recommended more stringent chlorine limitations to the DNR. On October 8, 1974, the proposed EPA guidelines were published as 40 C.F.R. Part 423. The DNR issued WPDES permits to Wisconsin Electric on December 31, 1974, and these permits contained the more stringent limitations recommended by Manzardo. Thus, following *Niagara of Wis. Paper Corp. v. DNR, supra,* it must be concluded that the DNR has violated sec. 147.021, Stats., by issuing permits containing chlorine limitations more stringent than those in 40 C.F.R. Part 423.13, and the permits should be modified to meet the federal limitations.

In addition to violating sec. 147.021, Stats., the adoption of the chlorine limitations contained in Wisconsin Electric's permits also contravened sec. 227.02(1). Sec. 227.02 requires an agency to precede all rule making with notice and public hearing, unless the rule falls into one of five categories, none of which is applicable here. That section states:

"*227.02* **When hearings required.** (1) An agency shall precede all its rule making with notice and public hearing unless:

" (a) The proposed rule is procedural rather than substantive; or

" (b) The proposed rule is designed solely to bring the language of an existing rule into conformity with a statute which has been changed or adopted since the adoption of such rule, to bring the language of an existing rule into conformity with a controlling judicial decision, or to comply with a federal requirement; or

" (c) The proposed rule is adopted pursuant to s. 227.027 as an emergency rule; or

" (d) It is the adoption, revocation or modification of a statement of general policy coming within the provisions of s. 227.01 (4) ; or

" (e) The proposed rule is published in the notice section of the administrative register together with a statement to the effect that the agency will adopt the proposed rule without public hearing thereon unless, within 30 days after publication of the notice, it is petitioned for a public hearing on the proposal by 25 persons who will be affected by the rule, a municipality which will be affected by the rule, or an association which is representative of a farm, labor, business or professional group which will be affected by the rule. If the agency receives such a petition it shall not proceed with the proposed rule making until it has given notice and held a hearing as prescribed by ss. 227.021 and 227.022.

"*(2)* The exceptions to the general hearing requirement which are set forth in sub. (1) do not apply if:

" (a) Another section of the statutes specifically requires the agency to hold a hearing prior to adoption of the proposed rule under consideration; or

" (b) The agency determines that a hearing is desirable, in which event the agency has discretion to determine what kind of hearing it will hold and what kind of notice it will give."

Wisconsin Electric did petition the DNR for a review hearing of the permit limitations as provided in sec. 147.20, Stats., and the DNR issued the notices required by that statute. However, such a hearing held at the in-

stance of the permit applicant does not constitute compliance with the notice and hearing requirements of sec. 227.02(1) which relate to rule making.

## II.

The DNR contends that although the chlorine limitations contained in the permits are more stringent than the limitations set forth in Wis. Adm. Code ch. NR 290 they are not necessarily invalid.

Wisconsin Adm. Code ch. NR 290 was adopted pursuant to ch. 147, Stats., and contains effluent limitations for discharges from steam electric power generating plants. Sec. NR 290.10, entitled "Effluent limitations, best practicable treatment," provides in part:

"*(3)* The quantity of pollutants in each of the flows identified in Table 1 shall not exceed for any subcategory the quantity determined by multiplying the flow by the concentration of each pollutant listed in that table.

Table 1
BPT Effluent Limitations in mg/l

| Flow | TSS Ave. | TSS Max. | Oil & Grease Ave. | Oil & Grease Max. | Iron[1] Ave. | Iron[1] Max. | Copper[1] Ave. | Copper[1] Max. | FAC[2] Ave. | FAC[2] Max. |
|---|---|---|---|---|---|---|---|---|---|---|
| Low volume waste | 30 | 100 | 15 | 20 | | | | | | |
| Ash transport water | 30 | 100 | 15 | 20 | | | | | | |
| Boiler blowdown | 30 | 100 | 15 | 20 | 1.0 | 1.0 | 1.0 | 1.0 | | |
| Metal cleaning wastes | 30 | 100 | 15 | 20 | 1.0 | 1.0 | 1.0 | 1.0 | | |
| Once through cooling water | | | ı | | | | | | 0.2 | 0.5 |
| Cooling tower blowdown | | | | | | | | | 0.2 | 0.5 |
| Material storage and construction runoff | | 50 | | | | | | | | |

"Note: (1) as total iron or total copper
(2) 'FAC' means free available chlorine as defined in section NR 290.03(7).

"*(4)* Neither free available chlorine nor total residual chlorine may be discharged from any unit for more than 2 hours in any one day and not more than one unit in any

plant may discharge free available or total residual chlorine at any one time unless the utility can demonstrate to the department that the units in a particular location cannot operate at or below this level of chlorination."

Sec. NR 290.11, entitled "Effluent limitations, best available treatment," provides in part:

"*(3)* The quantity of pollutants in each of the flows identified in Table 2 shall not exceed for any subcategory the quantity determined by multiplying the flow by the concentration of each pollutant listed in that table, . . .

Table 2
BAT Effluent Limitations in mg/l

| Flow | TSS Ave. | TSS Max. | Oil & Grease Ave. | Oil & Grease Max. | Iron(1) Ave. | Iron(1) Max. | Copper(1) Ave. | Copper(1) Max. | FAC(2) Ave. | FAC(2) Max. |
|------|------|------|------|------|------|------|------|------|------|------|
| Low volume waste | 30 | 100 | 15 | 20 | | | | | | |
| Bottom ash transport water | 30 | 100 | 15 | 20 | | | | | | |
| Boiler blowdown | 30 | 100 | 15 | 20 | 1.0 | 1.0 | 1.0 | 1.0 | | |
| Metal cleaning wastes | 30 | 100 | 15 | 20 | 1.0 | 1.0 | 1.0 | 1.0 | | |
| Fly ash transport water | 30 | 100 | 15 | 20 | | | | | | |
| Once through cooling water | | | | | | | | | 0.2 | 0.5 |
| Cooling tower blowdown(3) | | | | | | | | | 0.2 | 0.5 |
| Material storage and construction runoff | | 50 | | | | | | | | |

"Note:  (1) as total iron or total copper
    (2) 'FAC' means free available chlorine as defined in section NR 290.03(7).
    (3) . . . . . .

"*(4)* Neither free available chlorine nor total residual chlorine may be discharged from any unit for more than two hours in any one day and not more than one unit in any plant may discharge free available or total residual chlorine at any one time unless the utility can demonstrate to the department that the units in a particuar location cannot operate at or below this level of chlorination."

These are the same standards contained in 40 C.F.R. Part 423.13.

The department hearing examiner concluded that sec. 147.02(3) gives the DNR the authority to impose a limitation in a WPDES permit which is more stringent than the effluent limitations contained in sec. NR 290.10 and 290.11.

Sec. 147.02(3), Stats., provides:

". . . The department may issue a permit for the discharge of any pollutant, or combination of pollutants, other than those prohibited under sub. (2),[7] upon condition that such discharges will meet all the following, whenever applicable:

"(a) Effluent limitations;

"(b) Standards of performance for new sources;

"(c) Effluent standards, effluents prohibitions and pretreatment standards;

"(d) Any more stringent limitations, including those:

"1. Necessary to meet federal or state water quality standards, or schedules of compliance established by the department; or

"2. Necessary to comply with any applicable federal law or regulation; or

"3. Necessary to avoid exceeding total maximum daily loads established pursuant to a continuing planning process developed under s. 147.25.

"(e) Any more stringent legally applicable requirements necessary to comply with an approved areawide waste treatment management plan."

Also, Wis. Adm. Code sec. NR 290.06, states:

"*NR 290.06* **Application of effluent limitations and standards.** (1) The effluent limitations and standards set forth in this chapter shall be used in accordance with this section to establish the quantity or quality of pollutants or pollutant properties which may be discharged by a point source subject to the provisions of this chapter, except as;

"(a) They may be modified in accordance with section NR 290.05.

---

[7] Sec. 147.02(2), Stats., is not applicable.

"(b) They may be superseded by more stringent limitations and standards necessary to achieve water quality standards or meet other legal requirements, or

"(c) They may be supplemented or superseded by standards or prohibitions for toxic pollutants or by additional limitations for other pollutants required to achieve water quality."

Specifically, the hearing examiner held that sec. 147.02 (3)(d)1 gave the DNR authority to impose a more stringent limitation when necessary to meet federal or state water quality standards. The water quality standards which the examiner found to be applicable are Wis. Adm. Code secs. NR 102.02(1)(d) and 102.02(3)(d).

Wis. Adm. Code ch. NR 102 is entitled "Water Quality Standards for Wisconsin Surface Waters" and was adopted pursuant to ch. 144, Stats. Secs. NR 102.02(1) (d) and 102.02(3)(d) provide:

"*NR 102.02* **Categories of standards.** (1) GENERAL. To preserve and enhance the quality of waters, standards are established to govern water management decisions. Practices attributable to municipal, industrial, commercial, domestic, agricultural, land development or other activities shall be controlled so that all waters including the mixing zone and the effluent channel meet the following conditions at all times and under all flow conditions:

". . .

"(d) Substances in concentrations or combinations which are toxic or harmful to humans shall not be present in amounts found to be of public health significance, nor shall substances be present in amounts which are acutely harmful to animal, plant or aquatic life.

". . .

"(3) STANDARDS FOR FISH AND AQUATIC LIFE. Except for natural conditions, all waters classified for fish and aquatic life shall meet the following criteria:

". . .

"(d) Unauthorized concentrations of substances are not permitted that alone or in combination with other

materials present are toxic to fish or other aquatic life. Questions concerning the permissible levels, or changes in the same, of a substance, or combination of substances, of undefined toxicity to fish and other biota shall be resolved in accordance with the methods specified in 'Water Quality Criteria,' Report of the National Technical Advisory Committee to the Secretary of the Interior, April 1, 1968. The committee's recommendations will also be used as guidelines in other aspects where recommendations may be applicable."[8]

The hearing examiner found that "chlorine is a substance which when discharged at certain concentrations can be acutely harmful or toxic to aquatic life." The examiner also found that the chlorine limitations contained in Wisconsin Electric's permits

". . . are derived from Sections NR 102.02(1)(d) and 102.02(3)(d) of the Wisconsin Administrative Code, as well as scientific data verifying the toxicity of chlorine to aquatic life at levels higher than authorized by the permit. Said limitations are reasonable and a valid exercise of authority by the Department of Natural Resources under Chapters 144 and 147, Wisconsin Statutes."

And in his conclusions of law the examiner stated that those two sections "are validly promulgated water quality standards of the State of Wisconsin which prohibit the introduction into the waters of the state substances which are toxic or acutely harmful to aquatic life."

Wisconsin Electric contends that the imposition of the chlorine limitations is not authorized by sec. NR 102.02(1)(d) and 102.02(3)(d) because neither of those subsections mentions chlorine. However, those subsections do refer to toxic substances. The examiner found that chlorine can be acutely harmful or toxic when dis-

---

[8] *See: Wis. Elec. Power Co. v. Wis. Natural Resources Bd.*, 90 Wis.2d 656, 280 N.W.2d 218 (1979).

charged at certain concentrations and found that scientific data verified the toxicity of chlorine to aquatic life at levels higher than authorized by the permits. Neither of these findings is challenged on appeal. Therefore, it would seem that the DNR had authority under sec. 147.02(3)(d)1 to issue the permits containing more stringent chlorine limitations under certain defined circumstances. And because sec. 147.02(3)(d)1, Stats., allows for more stringent limitations if necessary to meet certain water quality standards, sec. 147.021 would not bar the inclusion of the chlorine limitations in the WPDES permits. *Niagara of Wis. Paper Corp. v. DNR, supra,* at 53, 54.

However, the hearing before the department was conducted pursuant to sec. 147.20, Stats. Wisconsin Electric filed a petition for a review of the "reasonableness of or necessity for" the chlorine limitations contained in its permits. An adequate review under sec. 147.20 would require findings of fact and conclusions of law as to both the reasonableness of and the necessity for the specific chlorine limitations. Findings of fact regarding the reasonableness of the chlorine limitations contained in the permits were made with a single finding referring to the department's authority and "scientific data" utilized in setting such limitations. The problem dealt with in this case is highly complex. Yet this finding of fact determines the reasonableness of the chlorine limitations without speaking, as the trial court states, "to the technical feasibility of meeting the limits, the practicality and expense of meeting the limits, alternatives to the use of chlorine, alternative control measures, social costs of acting upon or without these limits, or any other relevant area of inquiry." Without these specifics, the findings are so vague and obscure that judicial review is impossible.

### III.

The circuit court held that the chlorine limitations in Wisconsin Electric's permits were not "rules" as defined in sec. 227.01(9), Stats., but were in the nature of "orders" as stated in sec. 227.01(11)(c). The trial court held that the DNR failed to comply with Wis. Adm. Code sec. NR 1.50(3)(a) which sets forth procedural requirements for issuance of "special orders," and, therefore, the "orders" are null and void.

Since we conclude the chlorine limitations in the permits are "rules," it follows that they cannot be "orders." The term "rule" and the term "order" are mutually exclusive. Sec. 227.01(3), Stats. 1973 (presently sec. 227.10(9)), defines the word "rule," and sec. 227.01(5)(c), Stats. 1973 (presently sec. 227.01(11)(c)), excludes the term "order" from the definition of "rule." In addition, Wis. Adm. Code sec. NR 1.50, defines "rule" and "special order" separately:

"*NR 1.50* **Policy on issuance of environmental pollution orders.** (1) DEFINITIONS. . . .
" . . .
"(e) 'Rule' means a regulation, standard, statement of policy or general order (including the amendment or repeal of any of the foregoing), of general application and having the effect of law, issued by the department to implement, interpret or make specific legislation enforced or administered by the department or to govern the organization or procedure of the department.
" . . .
"(g) 'Special orders' of the department mean orders issued by the department applicable to and directing specific persons to secure operating results in the control of environmental pollution within the time or times prescribed in the orders."

Regardless of whether the chlorine limitations are "rules," the requirements in Wis. Adm. Code sec. NR

1.50 (3) (a) are not applicable to this case. We are of the opinion that the chlorine limitations inserted in the permits are not "special orders" as defined in sec. NR 1.50 (1) (g), above, but they are provisions of a "permit" as defined in sec. 147.015 (15), Stats., and Wis. Adm. Code sec. NR 3.01 (3). The requirements for issuance of permits are contained in ch. 147, Stats. and Wis. Adm. Code ch. NR 3. Nowhere in ch. 147 does the term "special order" appear. Special orders are issued to enforce the standards contained in Wis. Adm. Code ch. NR 102 and these special orders are authorized by sec. 144.025 (2) (d) 1, which provides:

". . . (d) 1. The department may issue special orders directing particular owners to secure such operating results toward the control of pollution of the waters of the state as the department prescribes, within a specified time. Pending efforts to comply with any order, the department may permit continuance of operations on such conditions as it prescribes. If any owner cannot comply with an order within the time specified, he may, before the date set in the order, petition the department to modify the order. The department may modify the order, specifying in writing the reasons therefor. If any order is not complied with within the time period specified, the department shall immediately notify the attorney general of this fact. Within 30 days thereafter, the attorney general shall forthwith commence an action under s. 144.536."

The requirements for issuance of special orders are contained in Wis. Adm. Code sec. NR 1.50 (3) (a) :

"(3) SPECIAL ORDERS. (a) *Water pollution.* Special orders shall be issued by the department only after a hearing held for the purpose of ascertaining whether such orders are necessary for controlling or abating environmental pollution. Each proposed special order shall be served upon the persons affected thereby together with the notice of hearing thereon. The notice of hearing shall also be published as a class 1 notice in

a newspaper having wide distribution in the area. Not less than 10 days notice specifying the time and place of the hearing shall be given by the department. The hearing shall be conducted in accordance with and be governed by chapter 227 Wis. Stats. After the hearing, the proposed special order may be set aside or it may be modified, amended or affirmed in whole or in part and a special order issued accordingly."

Review of "permits" is provided in sec. 147.20, which was utilized in this case, while "orders" are reviewed pursuant to secs. 144.10 and 144.56.

## IV.

Wisconsin Electric contends that the chlorine limitations contained in its permits violate sec. 147.05, Stats., because they were adopted without the required notice and hearing.

Sec. 147.05, Stats., provides:

"*147.05*  **Water quality related limitations.**

"(1) Whenever, after public hearing, the department finds that discharges of pollutants from a point source or group of point sources, with the application of all applicable effluent limitations under s. 147.04(2)(b) or (3)(b), would interfere with the attainment or maintenance in specific portions of waters of the state of that water quality which shall assure protection of public water supplies, agricultural and industrial uses, and the protection and propagation of a balanced population of shellfish, fish and wildlife, and allow recreational activities in and on the water, the department shall establish effluent limitations for each such point source which can reasonably be expected to contribute to the attainment or maintenance of such water quality on such portions of the waters of the state and shall require compliance with any such limitations in any permit issued.

"*(2)* Prior to establishment of any effluent limitation under sub. (1), the department shall issue notice of intent to establish such limitation and shall hold

a public hearing under s. 147.20 to determine the relationship of the economic and social costs of achieving such limitation, including any economic or social dislocation in the affected community or communities, to the social and economic benefits to be obtained, including the attainment of the objectives of this chapter, and to determine whether such effluent limitations can be implemented with available technology or with other alternative control strategies."

The notice and hearing requirements of sec. 147.05 (2), Stats., are established by reference to sub. (1) of sec. 147.05 and sub. (1) refers us to the provisions of sec. 147.04 (2) (b) or (3) (b). The trial court concluded that these sections apply only to effluent limitations established by rule and since it was the conclusion of the trial court that the imposition of the chlorine limitations set forth in the permits did not constitute the establishment of rules, it held that sec. 147.05 was not applicable in this case.

Sec. 147.04, Stats., provides:

"*(2)* The department shall establish by rule effluent limitations for each such category or class of point sources, other than publicly owned treatment works, which shall require:
"(a) By not later than July 1, 1977, the application of the best practicable control technology currently available. . . .
"(b) By not later than July 1, 1983:
"1. The application of the best available technology economically achievable for such category or class which will result in the elimination of the discharge of all pollutants, if the department finds that such elimination is technologically and economically achievable for a category or class of point sources, or in the case total elimination is not technologically and economically achievable, which will result in reasonable further progress toward the goal of eliminating discharge of all pollutants. . . .
"   ". . . .

"*(3)* The department shall by rule promulgate effluent limitations for publicly owned treatment works which shall require:

"(a) By July 1, 1977, secondary treatment for all publicly owned treatment works in existence on that date or approved prior to June 30, 1974, for which construction shall be completed within 4 years of approval;

"(b) Not later than July 1, 1983, the application of the best practicable waste treatment technology over the life of the works consistent with the purposes of this chapter."

Both parties agree that the chlorine limitations in the permits are "water quality related limitations." Consequently, the limitations are subject to the procedural requirements of sec. 147.05, Stats., regarding establishment of water quality related limitations. None of these requirements was met when the DNR opted to use the chlorine limitations recommended by Manzardo and inserted them in Wisconsin Electric's permits. Thus, the DNR did not comply with the provisions of sec. 147.05.

Furthermore, we are of the opinion the trial court was incorrect in concluding that sec. 147.05, Stats., only applies to water quality related effluent limitations established by rule. Unlike secs. 147.04 (2) (b) and 147.04 (3) (b), requiring the DNR to establish by rule effluent limitations requiring application of the best available technology (BAT) and the best practicable technology (BPT), there is no requirement in sec. 147.05 that water quality related limitations be promulgated by rule. Instead, sec. 147.05 provides a mechanism for establishing water quality related limitations for discharge of pollutants from point sources if the BAT and BPT effluent limitations become inadequate.

Thus, the imposition of such chlorine limitations in Wisconsin Electric's permits was contrary to sec. 147.05,

Stats., because it was not preceded by notice and public hearing as required by the statute.

## V.

Wisconsin Electric contends that the DNR violated sec. 227.09 (4), Stats. (formerly sec. 227.12), in issuing its decision.

Sec. 227.09 (4), Stats., provides:

". . . Notwithstanding any other provision of this section, in any contested case, if a majority of the officials of the agency who are to render the final decision have not heard the case or read the record, the decision, if adverse to a party to the proceeding other than the agency itself, shall not be made until a proposed decision is served upon the parties and an opportunity is afforded to each party adversely affected to file objections and present briefs or oral argument to the officials who are to render the decision. The proposed decision shall contain a statement of the reasons therefore and of each issue of fact or law necessary to the proposed decision, prepared by the hearing examiner or a person who conducted the hearing or one who has read the record. The parties by written stipulation may waive compliance with this subsection."

Specifically, Wisconsin Electric states that the Natural Resources Board neither heard this case nor read the record, and alleges that at the January 6, 1976, hearing Wisconsin Electric requested a copy of the proposed decision and an opportunity to argue orally and in writing before the members of the agency who would be participating in the decision. Nevertheless, Wisconsin Electric argues, it neither received a copy of the proposed decision nor was it afforded an opportunity to file objections or present oral arguments to the board as required by the statute.

There is nothing in the record to indicate that the record was not read by a majority of the officials of the

Natural Resources Board, and it cannot be assumed that the record was not so read. While it would seem good practice and procedure would dictate that the findings of the agency reflect that a majority of the members thereof either heard the case or read the record, we do not find this argument persuasive in this case.

Although we reach the same ultimate conclusion as the trial court, we do so upon different grounds. Therefore, the judgment of the trial court is affirmed and the cause remanded to the circuit court with directions for remand to the Wisconsin Department of Natural Resources for further proceedings not inconsistent with this opinion.

*By the Court.*—Judgment affirmed and cause remanded for further proceedings not inconsistent with this opinion.

ABRAHAMSON, J., concurs.